NORELL SANDERS, Petitioner-Appellee, v. O.D. SHEPHARD, Respondent-Appellant.

First District (4th Division)   No. 1—91—1872

Opinion filed February 10, 1994.

Steven E. Glink, of Chicago, for appellant.

Joan S. Colen and Cathleen Cohen, both of Legal Assistance Foundation of Chicago, of Chicago, for appellee.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

We review the fourth consecutive order finding O.D. Shephard in contempt and incarcerating him for failure to return his daughter, Deborah Sanders, to her mother, Norell Sanders.

In 1987 Norell Sanders petitioned the court for an order of protection against Shephard pursuant to the Illinois Domestic Violence Act of 1986 (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 2311—1 *et seq.*). The court granted the order of protection and ordered Shephard to appear in court with the minor child. (See Ill. Rev. Stat. 1987, ch. 40, par. 2312—14(b)(7) (now 750 ILCS 60/214(b)(7) (West 1992)).) When Shephard appeared in court without Deborah, the court found him in contempt and ordered him jailed until he complied with the order. Shephard remains at the Cook County House of Corrections because the court continues to find he is able to produce the child and the incarceration has not lost its coercive effect.

Here is the history of the case. On September 18, 1986, Shephard was convicted of abducting his child, Deborah, from her mother, Norell Sanders. (See Ill. Rev. Stat. 1983, ch. 38, par. 10—5(b)(3).) He was sentenced to a maximum three-year prison term. Shortly after Shephard was paroled in October 1987, Sanders filed an *ex parte* petition for an order of protection under the Illinois Domestic Violence Act. Sanders also petitioned that Shephard be required to produce Deborah under section 214(b) of the Act.

On November 19, 1987, the court held a hearing at which Sanders presented evidence to show Shephard had the ability to produce Deborah. Six witnesses testified.

Sanders testified that Shephard telephoned her on September 27, 1984, and said he was going to take their two-year-old daughter Deborah where Sanders would never see her again. She testified that Shephard came over to her apartment, they struggled over the child, and then Shephard left with Deborah. A few days later Shephard telephoned Sanders and said he was not going to return Deborah and if Sanders called the police she would see Deborah in a pine box. Sanders said Shephard telephoned on October 1, 1984, and threatened to kill her and Deborah because the police were questioning his family. On October 18, 1984, when Shephard telephoned, he allowed Deborah to speak with Sanders. Shephard telephoned again at the end of October and told Sanders he abandoned Deborah in Arkansas or Memphis. When Shephard telephoned again in November 1984, he asked Sanders to pay him $2,000 to return Deborah to her safely. Sanders said that she did not see Shephard again until July 1985 when she was a witness at his trial for child abduction. She further testified that Shephard never returned Deborah to her and that she had not seen Deborah since September 27, 1984.

Mary Ruth, Sanders' cousin, testified that she was at Sanders' apartment almost every day since September 1984 and had not seen Deborah since then.

Hope Sanders testified that she was 14, lived with her mother Norell Sanders, and had not seen Deborah since the day she was taken.

O.D. Shephard testified that he was Deborah's father and the last time he saw Deborah was December 1984, when he "gave her back to her mother." He did not know Deborah's present whereabouts.

In rebuttal, Sanders called two witnesses. Frank McCall, a youth officer with the Chicago police department, testified that he began investigating Deborah's whereabouts in July 1985. The investigation revealed that Shephard's sister, his girl friend, and his mother each said they saw Deborah in a car with Shephard after a family funeral in Memphis, Tennessee, in October 1984. No one has seen Deborah since that date.

Glenna Sparks, a trooper with the Illinois State Police, testified that she was assigned to the child abuse division and had investigated the case since December 1986. She went to Sanders' apartment four times and did not see Deborah or any evidence that a child Deborah's age was living in the apartment. Sparks determined that Deborah's social security number had not been used anywhere in the nation. She also testified that missing person posters, with a picture of Deborah on them, were distributed to public schools in Illinois. The investigation had not revealed Deborah's whereabouts. When she interviewed Shephard, he told her he returned Deborah to her mother in December 1984.

Based on this testimony the court stated: "It is the opinion of this court the respondent knows where the child is and was the last person to be seen with her." In its order, the court wrote that Shephard's "proffered explanation that he returned the child to the Petitioner in December, 1984, is not credible and is therefore unworthy of belief." The court ordered Shephard incarcerated for six months or until he "purges himself of contempt by returning Deborah Sanders to the Petitioner."

Six months later, on May 17, 1988, Shephard had not produced Deborah, and again the court found him in contempt. Six months after that, on November 18, 1988, the court again found Shephard in contempt. Shephard appealed the three contempt orders. We consolidated the appeals and affirmed the trial court in *Sanders v. Shephard* (1989), 185 Ill. App. 3d 719, 541 N.E.2d 1150.

On May 17, 1989, the court again found Shephard in contempt and ordered him incarcerated until he returned Deborah to her

mother. Shephard also appealed this order, but this court dismissed the appeal because Shephard did not file the record in compliance with supreme court rules. On October 16, 1989, the trial court extended its previously issued order of protection to October 16, 1991, pursuant to section 220(e) (Ill. Rev. Stat. 1987, ch. 40, par. 2312—20(e)). Shephard filed a notice of appeal from this order on November 20, 1989, but this court dismissed it because it was not timely.

Then on December 21, 1990, Shephard filed a petition to vacate the contempt order of May 17, 1989. The trial court determined it had jurisdiction to decide the petition, the parties submitted briefs, and a hearing was held on April 16, 1991. The transcript of this hearing is not in the record. The court issued its ruling on May 2, 1991, and stated:

> "I did quite a bit of soul searching and thinking about this, and I was thinking about the effect of the three and a half years incarceration in the prison, and I was also thinking about the fact that, in my mind, I am convinced that [Shephard] can help us find this child. I am also thinking about the petitioner who doesn't know, hasn't known, where her child is for five or six years, and who probably will never know, unless the respondent decides to cooperate with us, which he won't.
>
> I am thoroughly convinced in my mind that he could be a great help, and I am thoroughly convinced that, at least, he can lead us on the path to where we can find this child.
>
> After a lot of consideration, deliberation, I don't think that his incarceration is, at the present time, punishment and uncoercive."

The court determined that Shephard did not produce any evidence to meet his burden of proving the incarceration had lost its coercive value other than his statement that it is obvious after over three years of incarceration that he cannot comply. The court stated the mere passage of more than three years is insufficient to prove the incarceration is no longer coercive. The court believed there was a realistic possibility that continued incarceration will coerce Shephard to comply with the order to produce Deborah and found Shephard's statement that he already returned Deborah to her mother unworthy of belief. Based on these findings the court denied the petition to vacate. It is from this order that Shephard appeals.

The issue we first address is whether Shephard's confinement for civil contempt violates the due process clause of the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV). Shephard and *amicus curiae* argue that his confinement no longer serves a coercive purpose and is punitive in nature in violation of his constitutional rights.

In the first appeal we held that the court's contempt orders were civil, because the purpose of each order was to compel Shephard to produce his daughter, not to punish him. (*Sanders*, 185 Ill. App. 3d at 729, 541 N.E.2d at 1156.) When we reviewed this case for the first time, Shephard had been incarcerated for 18 months. It is 1994. We are well aware Shephard has been incarcerated for six years.

■ Incarceration for civil contempt can continue only so long as it serves a coercive purpose. Once it is clear that a contemnor will not be compelled to comply, the rationale for the incarceration ceases— its character changes from remedial to punitive—and due process requires the contemnor's release. (See *In re Crededio* (7th Cir. 1985), 759 F.2d 589, 590; *Simkin v. United States* (2d Cir. 1983), 715 F.2d 34, 36-37; *Soobzokov v. CBS, Inc.* (2d Cir. 1981), 642 F.2d 28, 31.) The test to determine whether confinement no longer is coercive is whether the contemnor has shown there is no "realistic possibility" or "substantial likelihood" that continued confinement will accomplish its coercive purpose. (*Simkin*, 715 F.2d at 37-38; *In re Grand Jury Investigation* (3d Cir. 1979), 600 F.2d 420, 425.) At what point incarceration no longer serves a coercive purpose is a matter left to the discretion of the trial court to decide on a case-by-case basis. Incarceration for civil contempt may continue until the trial court finds, "after a conscientious consideration of the circumstances pertinent to the individual contemnor, that the contempt power has ceased to have a coercive effect." (*Simkin*, 715 F.2d at 37; *In re Grand Jury Investigation*, 600 F.2d at 428.) Once a court becomes convinced the contemnor will steadfastly refuse to comply with the terms of the contempt order, the court is "obligated to release [him] since incarceration would no longer serve the purpose of the civil contempt order—coercing [compliance]." *United States ex rel. Thom v. Jenkins* (7th Cir. 1985), 760 F.2d 736, 740.

Shephard acknowledges that he bears the burden to show there is no substantial likelihood that continued confinement will coerce him to produce Deborah. Yet to support his position that incarceration is not serving a coercive purpose, he merely states that because he has been in jail for a long time, "[i]t is obvious that [he] cannot or will not comply." Shephard introduced no other evidence in his motion to vacate before the trial court or in his briefs before this court to show he will not be coerced to comply. We believe the passage of time, standing alone, is insufficient to show an unwillingness forever to reveal the whereabouts of the child.

To further support his position, Shephard alleges the trial court "merely speculated" that the incarceration is serving its purpose. "Speculation" has several shades of meaning. The one most favorable

to Shephard is that the court has examined the matter before it with an element of doubt or without sufficient evidence to reach a sound or meaningful conclusion. The trial court must make its own prediction about the contemnor's future behavior. *Simkin*, 715 F.2d at 37.

The trial court's conclusion that Shephard's incarceration is coercive is not reduced to speculation in the sense that Shephard uses the word simply because it has yet to produce the desired result. The record shows the trial court carefully considered the unusual circumstances of this case. The court evaluated the credibility of the witnesses and found Shephard's testimony "unworthy of belief." The court considered the potential that Shephard would reveal Deborah's whereabouts and concluded there was a realistic possibility that continued incarceration will coerce him to do so. The court also considered the significance of the end to be achieved, finding the child, and balanced its interest in enforcing compliance with the order and Shephard's liberty. Based on this record we find the court did not abuse its discretion when it denied Shephard's motion to vacate the contempt order.

Shephard also argues that the court's judgment of contempt is against the manifest weight of the evidence because, he alleges, Sanders did not satisfy her initial burden of showing that Shephard had the ability to comply and that his failure to do so was intentional, wilful, or voluntary.

Justification for coercive imprisonment under civil contempt depends upon the ability of the contemnor to comply with the court's order. The contempt order entered on May 17, 1989, was based on the underlying order of protection entered in 1987 which required Shephard to produce his daughter. Shephard correctly states that a petitioner bears the initial burden of proof to show by a preponderance of the evidence that the respondent has the ability to produce a child before a court may grant a protection order requiring production of the child. We note that the duration of the protection order may not exceed two years (Ill. Rev. Stat. 1987, ch. 40, par. 2312—20(b)), although the court may extend the order under section 220(e) (Ill. Rev. Stat. 1987, ch. 40, par. 2312—20(e)). In *Sanders*, we found the evidence presented at the hearing on November 19, 1987, was sufficient to support the entry of the plenary protection order. (*Sanders*, 185 Ill. App. 3d at 728, 541 N.E.2d at 1155.) That finding has not been reviewed by the Illinois Supreme Court. Once a court of competent jurisdiction makes a factual finding and all appeals are exhausted, facts so established cannot be contravened by a party to that appeal in subsequent litigation. (See *Kazubowski v. Kazubowski* (1970), 45 Ill. 2d 405, 259 N.E.2d 282 (question raised in a prior appeal on the

merits cannot be urged on a subsequent appeal).) We are bound by our prior determinations and will not revisit issues decided in the first appeal. See also *Maggio v. Zeitz* (1948), 333 U.S. 56, 69, 92 L. Ed. 476, 487, 68 S. Ct. 401, 408 (contempt proceeding does not allow reconsideration of the legal or factual basis of the order alleged to have been disobeyed).

Once Sanders satisfied her burden of proof for the order of protection and the court entered a valid order requiring production, the burden of proving inability to comply with the court's order of production shifted to Shephard. *Sanders*, 185 Ill. App. 3d at 733, 541 N.E.2d at 1159, citing *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 469 N.E.2d 167; *Central Production Credit Association v. Kruse* (1987), 156 Ill. App. 3d 526, 509 N.E.2d 136. See also *United States v. Rylander* (1983), 460 U.S. 752, 757, 75 L. Ed. 2d 521, 528, 103 S. Ct. 1548, 1552 (once a party has been found in civil contempt for violating a valid court order, the burden shifts to the contemnor).

■ On May 17, 1989, the trial court determined, as it had previously on November 19, 1987, May 17, 1988, and on November 18, 1988, that Shephard provided no valid basis for his failure to comply with the court's order to return the child. In *Sanders* we held "the evidence presented to the trial court permits the inference that Shephard knows of the child's whereabouts, is able to obtain her presence in court, and has wilfully failed and refused to do so." (*Sanders*, 185 Ill. App. 3d at 733.) Although this holding is not *res judicata*, since each successive contempt hearing is a *de novo* proceeding, Shephard has presented no evidence to show he did not wilfully refuse to comply or could not comply with the court's order. Based on our earlier finding that the evidence was sufficient to support the underlying order of protection and the complete lack of subsequent evidence from Shephard, we find the court's order of contempt on May 17, 1989, was not against the manifest weight of the evidence.

Shephard next argues the Illinois Domestic Violence Act is unconstitutional because it lacks adequate procedural due process guarantees. He attacks the Act because it does not require prior notice before an emergency protection order is issued, does not provide a respondent the opportunity to obtain counsel, and does not require notice before a plenary order of protection is issued.

■ Shephard argued and we disposed of these issues in the first appeal. Issues presented and disposed of in a prior appeal are binding and will control in a subsequent appeal unless the facts presented in the subsequent appeal are so different as to require a different interpretation. (*Turner v. Commonwealth Edison Co.* (1978), 63 Ill. App. 3d

693, 380 N.E.2d 477.) The facts here are not different. We will not allow a party to reargue an issue decided by this court; the remedy for a dissatisfied party is to file a petition for rehearing or a petition for leave to appeal to the Illinois Supreme Court.

Shephard next contends that the successive contempt orders violate double jeopardy. We also decided this issue in the first appeal and will not revisit it here.

■ Finally, Shephard argues the trial court erred when it denied his emergency motion to terminate confinement. When the underlying order of protection expired on October 16, 1991, Sanders failed to immediately seek leave to extend the order. Shephard filed a motion to terminate his confinement, and the court denied the motion on November 21, 1991. Shephard did not appeal this order. Therefore, he cannot attack its propriety in these proceedings. *In re G.B.* (1980), 88 Ill. App. 3d 64, 410 N.E.2d 410.

Affirmed.

JOHNSON and HOFFMAN, JJ., concur.