No.  2--00--1482     

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE CITY OF NAPERVILLE,
 ) Appeal from the Circuit Court

    )  of Du Page County.

Plaintiff-Appellant, ) 

) ) 

v. ) No. 99--ED--11

  )

OLD SECOND NATIONAL BANK OF  )

AURORA, as Trustee under Trust  )

Agreement Dated July 21, 1967,  )

and known as Trust No. 1046;  )

OLD SECOND NATIONAL BANK OF  )

AURORA; JEROME A. AHASIC; ALICE )

ROSE AHASIC; LEO J. AHASIC;  )

JANET L. AHASIC; CASPER A.  ) 

AHASIC; MARY ANN AHASIC;  )

WILLIAM J. AHASIC; DELIGHT  )

MICHAEL AHASIC; H&R BLOCK;     )

CIPHER GAME AND HOBBY; DAVID    )

ROE, d/b/a Shearlock Combs; and )

UNKNOWN OWNERS,  ) Honorable

) Hollis L. Webster,

Defendants-Appellees. ) Judge, Presiding.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiff, the City of Naperville (Naperville), appeals from the August 24, 2000, order of the circuit court of Du Page County dismissing its condemnation action.  The trial court dismissed the action after finding that Naperville did not make a 
bona
 
fide
 attempt to agree on compensation with the owners of the property prior to filing its complaint as required by section 7--102 of the Code of Civil Procedure (the Code) (735 ILCS 5/7--102 (West 1998)).  We affirm.

On April 23, 1999, Naperville filed a complaint seeking to condemn the property located at 420-436 Washington Street (the Washington Street property) in Naperville.  This property is approximately one-third of an acre and is adjacent to the Du Page River in Naperville.  In its complaint, Naperville alleged that it was necessary to acquire the property in order to construct certain improvements to the Naperville River Walk.

The legal owner of the property is defendant Old Second National Bank of Aurora, as trustee under a trust agreement dated July 21, 1967, and known as trust No. 1046.  The beneficiaries of the land trust include defendants Delight Michael Ahasic, Leo Ahasic, Sr., Jerome Ahasic, and Casper Ahasic (the Ahasics).  On January 11, 2000, the defendants filed a traverse and a motion to dismiss.  As subsequently amended, the motion alleged various defenses, including that Naperville failed to make a 
bona
 
fide
 attempt to agree on compensation prior to filing suit.

From August 18, 2000, through August 23, 2000, the trial court conducted an evidentiary hearing on the defendants' traverse and motion to dismiss.  The following evidence was introduced at the hearing.  Beginning in 1997, the Ahasics were involved in litigation in the circuit court of Kane County to wind up a partnership that they had formed (the partnership litigation).  Apparently, this litigation was acrimonious, and there were many disagreements among the Ahasics concerning the disposition of certain partnership property.  As part of this litigation, the circuit court of Kane County entered an order directing that the Washington Street property be sold.  Any sale of the property was subject to the court's approval.  Additionally, any partner had the right of first refusal.  Steve Stephens was retained as the real estate agent to list and sell the property.  Accountant Michael Beilman was appointed by the circuit court to oversee the disposition of all the partnership assets.

Stephens subsequently listed the Washington Street Property  for $634,000.  Stephens arrived at the listing price as a result of a market analysis he had prepared.  In valuing the property, Stephens used three different methods: the cost approach, the market approach, and the income approach.  Stephens determined that the value of the property under the cost approach was $532,000; the value of the property under the market approach was $572,000; and the value of the property under the income approach was $634,000.  Stephens testified that he decided to utilize the income approach in setting the listing price.

Stephens acknowledged that he was not a licensed real estate appraiser.  Stephens also acknowledged that, at the time he performed the market analysis for the property, he did not have a survey, a title report, or any environmental survey for the property.  Stephens testified that his analysis assumed that the property was clean and did not have any environmental problems.  Stephens acknowledged that the property previously had been used as an automobile dealership.  There was also evidence that a dry cleaning service had been operated on the property.

In September 1998, Stephens contacted Peter Crawford and told him that the property was for sale.  Crawford was the architect of the Naperville River Walk project.  Crawford became interested in the property and contacted Craig Bloomquist, the assistant city manager for Naperville.  Naperville subsequently obtained an appraisal that valued the property at $500,000.  This appraisal assumed that there were no environmental problems associated with the property.  In executive session, Naperville's city council authorized a payment of between $250,000 and $300,000 as its share of the cost of acquiring the property.  The Du Page County Forest Preserve District also committed $250,000 as its share of the acquisition cost.

On November 6, 1998, Naperville made its first offer to purchase the property.  The offer was for $200,000, and was conveyed to Beilman and Stephens.  In presenting Naperville's offer, Bloomquist indicated that the offering price of $200,000 was based upon potential environmental concerns and the expense that would be incurred in demolishing the building on the property.  The offer contained a due diligence contingency, which allowed Naperville 90 days to investigate the property's environmental condition as well as other aspects of the property.  The offer provided that Naperville could terminate the agreement at its discretion after performing these investigations if it determined the property was not suited for its intended purpose.  The Ahasics rejected the offer.

After the rejection of this offer, the Naperville city council authorized condemnation proceedings to obtain the property.  However, the city council instructed Bloomquist to continue to negotiate with the Ahasics.  On February 1, 1999, Bloomquist conveyed an offer to purchase the property for $325,000.  This offer contained the same contingencies as the previous offer concerning the condition of the property.  In his letter communicating the offer, Bloomquist indicated that the city council had authorized condemnation proceedings to obtain the property. This offer was rejected by the Ahasics on February 8, 1999.  On March 25, 1999, Bloomquist submitted a third offer in the amount of $425,000, with the same contingencies.  The Ahasics also rejected this offer.

Other than Naperville's offers, the Ahasics received only one other written offer to purchase the property.  This offer was made on December 12, 1998, by Valencia, Inc., in the amount of $550,000.  However, the offer contained a number of contingencies, including (1) that the Ahasics pay for a Phase I environmental assessment; (2) that the Ahasics remedy any environmental contamination; (3) that the property be rezoned for Valencia's intended and ancillary uses;  and (4) that Valencia could terminate the contract for any reason whatsoever if it determined the property was not suitable for its use.  The Ahasics made a counteroffer to Valencia to sell the property for $614,000, on the condition that it withdraw all of the contingencies in their offer.  Valencia rejected this counteroffer, but increased the price of its original offer to $590,000 with the same contingencies detailed above.

On February 3, 1999, Valencia's offer of $590,000 was presented for approval to the circuit court presiding over the partnership litigation.  The court refused to approve the offer after Leo Ahasic, Jr., Jerome Ahasic, and Casper Ahasic exercised their right of first refusal and agreed to purchase the property on the same terms as the offer.  After Naperville filed its condemnation action on April 23, 1999, the circuit court in the partnership litigation granted leave to Leo Ahasic, Jr., Jerome Ahasic, and Casper Ahasic to withdraw their right of first refusal.

After considering all of this evidence and the arguments of counsel, the trial court in the instant case granted the traverse and dismissed the condemnation action.  Specifically, the trial court found that Naperville did not make a reasonable attempt to agree with the Ahasics as to the appropriate compensation for the property prior to filing their suit.  The trial court explained:

"And I simply believe that the case law strongly suggests that if there is only one appraisal here, the City knowing that there was a lawsuit pending in Kane County, knowing that there was a difficulty among the owners of this property to even agree among themselves, certainly had an obligation to at least meet their appraised value of the property before they proceeded to condemnation."

Following the denial of its motion to reconsider, Naperville filed a timely notice of appeal.

Prior to addressing the merits, we must first consider a motion that has been taken with the case.  The defendants argue that this appeal should be dismissed on jurisdictional grounds for lack of a final order.  After the trial court entered its order dismissing the complaint, the defendants filed a petition for attorney fees, costs, and expenses pursuant to section 7--123(a) of the Code (735 ILCS 5/7--123(a) (West 1998)).  Section 7--123(a) permits landowners who successfully defend against a condemnation action to recover their costs, expenses, and attorney fees.  735 ILCS 5/7--123(a) (West 1998)).  Because this petition remained pending at the time this appeal was filed, the defendants argue that the trial court's ruling on the motion to dismiss was not a final order.  The defendants assert that the order is therefore not appealable absent a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).

Contrary to the defendant's assertions, however, petitions for attorney fees pursuant to section 7--123(a) of the Code have been found to be collateral and incidental to the final judgment disposing of a condemnation action.  See 
Town of Libertyville v. Bank of Waukegan
, 152 Ill. App. 3d 1066, 1072-73 (1987).  Such petitions do not attack the trial court's judgment in the condemnation action and therefore are not considered posttrial motions for purposes of section 2--1203 of the Code (735 ILCS 5/2--1203 (West 1998)).  
Bank of Waukegan
, 152 Ill. App. 3d at 1072.  As such petitions do not affect the finality of the trial court's order disposing of the condemnation action, they do not nullify the effect of a notice of appeal filed within 30 days of the trial court's final order.  
Bank of Waukegan
, 152 Ill. App. 3d at 1072-73.  We therefore conclude that the trial court's order dismissing Naperville's condemnation action was a final order and hold that we have jurisdiction to hear the appeal.

Naperville's first contention on appeal is that the trial court erred in finding that it did not make a reasonable attempt to agree with the Ahasics as to the amount of compensation for their property prior to filing suit.  Naperville argues that it negotiated in good faith and that its offers were reasonable considering the possible environmental contamination on the property.  Naperville argues that the Ahasics never presented it with a counteroffer during the bargaining process and that it was not required to negotiate unilaterally.  See 
County Board of School Trustees v. Batchelder
, 7 Ill. 2d 178, 182 (1955); 
City of Oakbrook Terrace v. La Salle National Bank
, 186 Ill. App. 3d 343, 351 (1989).

Section 7--101 of the Code provides that "[p]rivate property shall not be taken or damaged for public use without just compensation."  735 ILCS 5/7--101 (West 1998).  A condition precedent to the exercise of the power of eminent domain is an attempt to reach an agreement with the property owner on the amount of compensation.  735 ILCS 5/7--102 (West 1998); 
Department of Transportation ex rel. People v. Brownfield
, 221 Ill. App. 3d 565, 567 (1991).  In this regard, the acquiring authority must make a 
bona
 
fide
 attempt to agree, and the attempt must be made in good faith.  
Brownfield
, 221 Ill. App. 3d at 567.  Where a gross disparity exists between the value placed on the property by the acquiring authority and the property owner and where the circumstances show that no practical solution can be reached, no further negotiations are necessary.  
Oakbrook Terrace
, 186 Ill. App. 3d at 351.

The issues raised on the traverse and motion to dismiss were preliminary questions to be determined by the trial court without a jury.  
Brownfield
, 221 Ill. App. 3d at 567.  The standard of review for a ruling on a traverse is whether the trial court's order was against the manifest weight of the evidence.  
Village of Round Lake v. Amann
, 311 Ill. App. 3d 705, 712 (2000).    A trial court's judgment is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.  
Ikari v. Mason Properties
, 314 Ill. App. 3d 222, 228 (2000).  During the hearing on a traverse and a motion to dismiss, the credibility of the witnesses and the weight to be given to their testimony are to be determined by the trial court.  
Brownfield
, 221 Ill. App. 3d at 567.

After a careful review of the record, we cannot say that the trial court's finding that Naperville failed to make a 
bona
 
fide
 attempt to reach agreement with the Ahasics was against the manifest weight of the evidence.  In September 1998, when Naperville became interested in the property, it obtained an appraisal indicating that the fair market value of the property was $500,000.  The city council thereafter authorized the expenditure of $300,000 as its share of the purchase price, and the Du Page County forest preserve district committed $250,000 as its share.  However, despite the availability of these funds, Naperville initially offered $200,000, which was only 40% of the property's appraised value.  The written minutes from Naperville's city council meetings indicate that, although the council was aware of the property's appraised value of $500,000, the council was only willing to offer up to 50% of the property's purchase price.  

After the Ahasics' rejection of this initial offer, Naperville's city council enacted an ordinance authorizing the initiation of condemnation proceedings on the property.  Naperville's remaining negotiations with the Ahasics were then prefaced with the threat that the city would initiate condemnation proceedings against the property.   Naperville's subsequent offers of $325,000 and $425,000 were also lower than the property's appraised fair market value.

Naperville posits two different reasons why it did not offer the property's appraised market value.  First, Naperville contends that the environmental condition of the property was unknown and that the city might have incurred significant expense to clean any contamination.  Naperville notes that the $500,000 appraisal assumed that there was no environmental contamination on the property.  However, such an argument is unpersuasive in light of the fact that Naperville's offer to purchase the property was contingent upon the performance of environmental testing.  The contract allowed Naperville to terminate the agreement at its discretion based upon the results from such testing.  As the contract protected Naperville from going through with the sale in the event of environmental contamination, we fail to understand why any discounting of the purchase price was necessary.

The second reason advanced by Naperville for why it did not offer the appraised value was that it that it had an obligation to its taxpayers to acquire the property for the lowest price possible.  Although we would certainly not dispute that cost-efficiency is generally a legitimate government interest, it must be balanced against the right of a property owner to get fair compensation for property that is being taking by the condemning authority.  See 735 ILCS 5/7--101 (West 1998) ("Private property shall not be taken or damaged for public use without just compensation ***").  The negotiations that precede a condemnation proceeding cannot be viewed in the same manner as negotiations between a private buyer and seller.  In a private negotiation, either party can walk away from the negotiation if the price is not right.  However, in a condemnation proceeding, the property owner does not have the same luxury.  If the property owner cannot agree to compensation with the condemning authority, he will incur the cost and expense of defending against a condemnation proceeding in order to secure the payment of the fair market value of the property.  It is for this reason that the condemning authority must make a good-faith effort to negotiate prior to filing suit.

A review of Illinois case law also refutes Naperville's assertion that it may seek to acquire the property for a bargain price.  In cases where Illinois courts have found that the condemning authority had satisfied its statutory obligation to make a 
bona
 
fide
 attempt to agree, the condemning authorities offered to purchase the properties for their appraised value.  See 
Peoples Gas Light & Coke Company v. Buckles
, 24 Ill. 2d 520, 526-28 (1962); 
Brownfield
, 221 Ill. App. 3d at 566-69; 
City of Oak Brook Terrace v. La Salle National Bank
, 186 Ill. App. 3d 343, 351 (1989); 
Waukegan Port District v. Booras
, 55 Ill. App. 3d 790, 792-94 (1977)
.  Indeed, our research has uncovered only one case in which the condemning authority failed to offer the appraised value, and in that case the court found that the condemning authority had failed to negotiate in good faith.  See 
Forest Preserve District v. Marquette National Bank
, 208 Ill. App. 3d 823, 827 (1991).  Although we are aware of no legal requirement that the condemning authority must offer the appraised value of the property in order to satisfy the negotiation requirements of section 7--102, we nonetheless believe that good faith requires that the condemning authority offer a price that correlates to the fair market value of the property as determined by the condemning authority.

Here, Naperville's appraiser valued the property at $500,000.  This valuation does not appear excessive in light of the fact that a third party offered $590,000 for the property.  Although Naperville asserts that the property was worth less than this because of potential environmental problems, it has failed to substantiate this claim with anything other than speculation.  We note that the burden of proof to show good-faith negotiation falls upon the condemning authority.  See 
Oak Brook Terrace
, 186 Ill. App. 3d at 348.  Naperville failed to offer any evidence at the hearing that the value of the property was less than the $500,000 appraised value.  As its offers for the property were substantially less than this amount, we do not believe that Naperville satisfied its statutory obligation to negotiate in good faith.

Naperville also maintains that it was excused from attempting further negotiation because the Ahasics never presented any counteroffers to sell the property.  Naperville argues that the law does not require it to negotiate unilaterally.  See 
Oak Brook Terrace
, 186 Ill. App. 3d at 351.  Although we agree that the law does not require the condemning authority to unilaterally continue negotiations when it has already offered the fair market value of the property, there is no evidence appearing in the record that Naperville ever offered to purchase the property for its fair market value.  It would be unreasonable to expect that the Ahasics would be willing to negotiate when Naperville repeatedly made offers that were well below the market value of the property.  Accordingly, for all the reasons discussed above, we do not believe that Naperville fulfilled its statutory obligation to make a good-faith attempt to agree on compensation prior to filing suit.

Naperville's second contention on appeal is that it was not required to negotiate because the Ahasics were incapable of consenting to the sale of the property.  Section 7--102 of the Code provides that the condemning authority may file a condemnation action without first attempting to negotiate with the property owner in instances where "the owner of the property is incapable of consenting."  735 ILCS 5/7--102 (West 1998).  Naperville argues that, in light of the contentious partnership litigation between the Ahasics, it was apparent that the Ahasics would be unable to agree on the sale of the property and were therefore incapable of consenting for purposes of the statute.  Naperville also argues that the Ahasics were incapable of consenting to the sale of the property because the circuit court in the partnership litigation had to approve any sale of the property.

This argument is without merit.  That portion of section 7--102 that excuses negotiation in instances where "the owner of the property is incapable of consenting" applies only where there is a legal impediment that prevents the property owner from consenting.  See 
Davis v. Northwestern Elevated Ry. Co.
, 170 Ill. 595, 600 (1897).  For example, the condemning authority need not negotiate with a minor, as a minor is without legal capacity to enter into contracts.  
Davis
, 170 Ill. at 600.  However, we do not believe that the Ahasics were legally incapable of consenting to the sale of the property merely because there were disagreements among them.  Nor do we believe that they were incapable of consenting because the circuit court in the partnership litigation had to approve any sale of the property.  The Ahasics retained the legal authority to entertain offers on the property and to bring such offers to the circuit court for approval.  Accordingly, we decline to apply the statutory exception and conclude that Naperville was obligated to make a good-faith attempt to agree prior to filing suit.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

HUTCHINSON, P.J., and CALLUM, J., concur.