2020 IL App (1st) 191053
No. 1-19-1053
Opinion filed May 11, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE CITY OF CHICAGO, a Municipal Corporation, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 L 50792 |
| | ) | |
| FRED J. EYCHANER and UNKNOWN OWNERS, | ) | |
| | ) | Honorable |
| Defendants | ) | Rita M. Novak and James M. |
| | ) | McGing, |
| (Fred J. Eychaner, Defendant-Appellant). | ) | Judges, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Griffin and Justice Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1 Fred Eychaner again challenges the City of Chicago's use of eminent domain to take his property. When the case was last before us, we upheld the taking, finding that the City could use eminent domain to take the property, which lies in a conservation area, to prevent future blight and to promote economic redevelopment. *City of Chicago v. Eychaner*, 2015 IL App (1st) 131833. We remanded, however, for a new trial on just compensation. After a jury awarded Eychaner $7.1 million in just compensation, he filed a posttrial motion renewing his argument on the taking's constitutionality. Eychaner conceded the binding effect of our decision but sought "to preserve"

the constitutional claim for possible review by the supreme court. He also moved to reconsider the denial of his original traverse based on purported changed circumstances, asserting the City adopted a new plan for the area so the taking no longer served a permissible public use.

¶ 2      The trial court denied the motion based on this court having remanded for the limited purpose of a new trial on just compensation. As to Eychaner's invocation of changed circumstances, the court noted that all the evidence of purported changed circumstances was available before the second trial, so Eychaner could have filed a new traverse or alerted the court to his claim of changed circumstances. The court also determined that the City's new plan adhered to the previous plan's goals of redeveloping a conservation area to promote economic revitalization and, thus, the taking continued to serve a constitutionally permissible public use.

¶ 3      Eychaner appeals, arguing the City may not use eminent domain to take property in a conservation area in the name of economic redevelopment. He also contends the trial court erred in denying his motion to reconsider based on the city's new redevelopment plan. We affirm. The law-of-the-case doctrine precluded the trial court, and now precludes us, from reconsidering the denial of Eychaner's traverse. As to the reconsideration, we agree with the trial court that the new plan adheres to the earlier plan so that the taking still serves a constitutionally permissible public use, and the trial court did not abuse its discretion in denying the motion.

¶ 4                          Background

¶ 5      We laid out the facts in detail in *Eychaner*, 2015 IL App (1st) 131833, and will summarize only the relevant facts.

¶ 6      Fred Eychaner owned vacant land at the southwest corner of Grand Avenue and North Jefferson Street in Chicago. At the end of 1999, the City proposed creating a planned

manufacturing district (PMD) there, aimed at protecting industrial jobs; preventing residential encroachment on existing manufacturing facilities; and encouraging manufacturers to invest, modernize, and expand their facilities. Residential uses are not permitted within PMDs. See Chicago Municipal Code §§ 17-6-0403-C, 17-6-0403-F (amended Sept. 10, 2014).

¶ 7 Blommer Chocolate Company's (Blommer) factory stood two blocks south of Eychaner's property. Blommer initially opposed its factory's inclusion in the PMD, raising concerns that residents of a nearby planned residential development would find the smell, noise, and traffic generated by the factory "intolerable." Blommer proposed two solutions: extending the PMD further south to provide a buffer between Blommer and the new residential development or not including Blommer in the PMD to allow it to sell its property more easily if conflicts with the residents forced it to relocate. Blommer also discussed with the City the possibility of acquiring property to the north of its factory, which did not include Eychaner's property, for a truck staging area.

¶ 8 The City wanted to keep the Blommer factory, and the City's plan commission spent months discussing alternative plans with Blommer to make sure that happened. Eventually, Blommer dropped its opposition in exchange for the City's willingness to help Blommer expand its industrial campus by acquiring nearby property to "create a buffer" between its operations and the proposed residential development. The plan commission recommended that the city council adopt the PMD. It did a few months later.

¶ 9 The City intended to fund the project though the River West Tax Increment Finance Redevelopment Plan (River West TIF). The City retained a private firm that commissioned studies and produced a 68-page report about the River West TIF. The report concluded:

[T]ax-increment financing would induce private investment and arrest blighting factors in the area. Because the area had not been subject to growth and reinvestment, the study reasoned that property owners would not invest in their properties without tax-increment financing. The study anticipated benefits, including: (i) stronger economic vitality; (ii) increased construction and long-term employment opportunities; (iii) replacement of inappropriate uses, blight, and vacant properties with viable, high-quality developments; (iv) the elimination of physical impediments, such as roads in poor condition; (v) the construction of public improvements to attract private investment; (vi) job-training services to make the area more attractive to investors and employers; and (vii) opportunities for minority- and women-owned businesses to share in the redevelopment."

¶ 10    Although Eychaner's property was not deemed blighted, the study stated that it met the requirements of a "conservation area" under the Tax Increment Allocation Redevelopment Act (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)) and, as a conservation area, "may become a blighted area" because of (i) deterioration, (ii) code violations, (iii) excessive vacancies, (iv) lack of community planning, and (v) lagging property values (*id.* § 11-74.4-3(b)). The City's community development commission recommended, and the city council adopted, the plan for the River West TIF.

¶ 11    A few months later, Blommer submitted a redevelopment proposal for its expanded campus. Blommer proposed acquiring 4.2 acres of land surrounding its factory, including Eychaner's land. Initially, Blommer offered to buy Eychaner's land, but he refused to sell. Then the City notified Eychaner of its possible taking of his property with the intent of conveying it to Blommer as part of its plan to expand its campus. After a public hearing, the city council passed an ordinance authorizing the taking. The ordinance considered the taking necessary to achieve the objectives of the River West TIF.

¶ 12                              Condemnation Proceedings

¶ 13    In August 2005, the City filed a complaint to condemn Eychaner's property through eminent domain. Eventually, the case proceeded to a jury trial on just compensation. The jury returned a verdict of $2.5 million. Eychaner appealed, challenging the denial of his traverse and the compensation award. To support his argument that the taking was unconstitutional, Eychaner relied primarily on *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 199 Ill. 2d 225 (2002) (*SWIDA*). There, the Illinois Supreme Court invalidated the taking of private property for an adjacent racetrack's parking lot that had a "purely private benefit and lack[ed] a showing of a supporting legislative purpose." *Id.* at 240. The *SWIDA* court held that the taking had "minimal public benefit" and that the "true beneficiaries *** are private businesses." *Id.* at 239-40.

¶ 14    Our opinion noted that the facts in *SWIDA*—significantly, a lack of a parking study or economic plan—showed it to be a sweetheart deal and that SWIDA did not intend to benefit the public. *Eychaner*, 2015 IL App (1st) 131833, ¶ 55. We acknowledged that "[r]ecognizing the difference between a valid public use and a sham can be challenging. But a telling feature of sound public use in the context of economic redevelopment is the existence of a well-developed, publicly vetted, and thoughtful economic development plan." *Id.* ¶ 71. That kind of plan was present in *Kelo v. City of New London*, 545 U.S. 469 (2005) and *People ex rel. Gutknecht v. City of Chicago*, 3 Ill. 2d 539 (1954), but "absent in *SWIDA*." *Eychaner*, 2015 IL App (1st) 131833, ¶ 71 ("SWIDA did not conduct or commission a thorough study of the parking situation at [the racetrack]. Nor did it formulate any economic plan requiring additional parking at the racetrack." (Internal quotation marks omitted.)). *Id.* ¶ 71.

¶ 15    On the contrary, the plans showed the City considering, in good faith, the taking of Eychaner's land as part of a "carefully formulated" economic development plan that "unquestionably serves a public purpose of preventing blight, promoting economic revitalization, and protecting existing industry." *Id. ¶* 63. We concluded, "the use of eminent domain to expand Blommer's campus passes constitutional muster because it aligns with the goals of the City's economic development plan to retain existing industry, prevent conflicts between residential and industrial use, and promote investment and revitalization in a conservation area." *Id. ¶* 78. We also found the trial court erred in excluding certain evidence and remanded for a new trial on just compensation. *Id. ¶* 105.

¶ 16                    The North Branch Framework

¶ 17    While on remand, the Chicago Plan Commission undertook a comprehensive review of 26 "industrial corridors" in the City to "address the modern realities of the city's industrial marketplace and its evolving role within the global economy." The commission selected a 760-acre area along the Chicago River, the North Branch, as the first industrial corridor for comprehensive review. This area includes Eychaner's property and the Bloomer factory. The review process, dubbed the "North Branch Framework," sought "to modernize existing land use regulations in the corridor to more effectively promote economic growth and job creation through the expansion of existing businesses and the attraction of new businesses, corporate headquarters and companies that drive Chicago's knowledge-based economy." It proposed allowing mixed-use development to "maximize[e] the North Branch as an economic engine and vital job center."

¶ 18    The North Branch Framework proposed dividing the corridor into three distinct zones. Eychaner's property and the Blommer factory lie in the "South Sub-Area," containing a mix of

industrial and office uses and abutting the downtown (D) zoning district and high-density, mixed-use properties. It proposed new land use regulations for the South Sub-Area that would provide for "higher density office; retail and select residential uses," while maintaining "[a]t least 50 percent of the corridor's land *** for employment-oriented development." To help implement its goals and principles, the framework recommended replacing the existing zoning for the South Sub-Area from PMD to "Downtown Service" (DS). DS zoning does not permit residential uses. "[E]xisting legal industrial uses would be permitted to continue without impact," and future zoning amendments in the South Sub-area would be "limited to Downtown Mixed-Use (DX)." DX includes multistory high-rise residential structures, which in recent years have become more prevalent in the area.

¶ 19     To address the possibility that some companies would decide to expand or relocate, the North Branch Framework proposed "allocating funding to provide the appropriate infrastructure and related amenities to accommodate ongoing shifts as needed." It recognized the importance of retaining industrial uses within the City's overall industrial corridor system and that "[l]and within the corridors that transitions to nonmanufacturing uses is a loss to the overall system and should entail compensation on behalf of the City's industrial base." A special fee to support the corridor system citywide "will be recommended for development projects that diminish the amount of corridor land that is used or designated for industry and related employment."

¶ 20                    Industrial Corridor System Fund Ordinance

¶ 21     After the plan commission issued its North Branch Framework, the City Council approved an ordinance creating an industrial corridor system fund. The ordinance, titled the "Industrial Corridor System Fund Ordinance," established " '[c]onversion areas' *** within the industrial

corridor system identified for potential zoning and/or other land use changes or modifications" and " '[r]eceiving corridors," "in which the primary sources of jobs are in industrial use categories." When property within a "conversion area" is rezoned, the City collects a "conversion fee." Industrial users that relocate from conversion areas to replacement sites in receiving corridors are exempted from paying the conversion fee to the City.

¶ 22     The ordinance's purpose was "to mitigate the loss of industrial land and facilities in conversion areas by generating funds for investment in receiving corridors in order to preserve and enhance the city's industrial base, support new and expanding industrial uses, and ensure a stable future for manufacturing and industrial employment in Chicago." The ordinance created a "North Branch Industrial Corridor Conversion Area," which included the Blommer factory and Eychaner property, and repealed the PMD zoning and replaced it with DS zoning.

¶ 23                                    The Sale of Blommer

¶ 24     Before the second just compensation trial, Fuji Oil Holdings, Inc. (Fuji), announced it had acquired all outstanding shares of Blommer for $750 million. Fuji said it intended to "[e]xpand business in North America, the largest market in the chocolate industry," and "maintain the management structure of [Blommer] with the current management team."

¶ 25                               Second Just Compensation Trial

¶ 26     At the second just compensation trial, the City and Eychaner presented expert witnesses who agreed that the highest and best use of the property would be a multistory high rise residential structure with ancillary commercial use. The property would have to be rezoned because DS zoning does not permit residential uses and the owner would have to pay a conversion fee, which

would be used to assist other industrial properties in the area. The expert witnesses agreed approval of the zoning change was reasonably probable.

¶ 27    The jury returned an award to Eychaner of $7.1 million. Eychaner filed a posttrial motion, which did not challenge the fair compensation award but renewed his argument that the City's exercise of eminent domain in a conservation area in the name of redevelopment was unconstitutional. Eychaner conceded that the trial court was bound by this court's decision but stated that he was "rais[ing] the issue again in order to preserve it for further judicial review in higher courts." Eychaner also sought reconsideration of the denial of his original traverse under section 2-1202(b) of the Code of Civil Procedure (735 ILCS 5/2-1202(b) (West 2018)), based on changed circumstances. He asserted the taking no longer served a permissible public use since the City had changed its plans for the area surrounding Eychaner's property. Specifically, Eychaner argued, "without the River West TIF Plan, there is no valid conservation plan—or any plan—on which the Blommer redevelopment project and the taking of defendant's property is based. It's a naked transfer of private property through the power of eminent domain to benefit a private party— now Fuji Oil Holdings, Inc. It is a taking for private, not public use, and is thus barred in Illinois." Eychaner wanted the trial court to vacate the judgment entered on the jury verdict and either reverse the ruling on the traverse or reconsider and reverse that ruling based on changed circumstances and dismiss with prejudice.

¶ 28    The trial court denied the motion on the basis of our having remanded for the limited purpose of a new trial on just compensation. As to changed circumstances based on the new plan, the trial court found that, since all the evidence of purported changed circumstances was available before the second trial, Eychaner could have filed a new traverse or alerted the court to his claim of changed circumstances. The court also held that the City's North Branch Framework adhered

to the River West TIF's goals of redeveloping a conservation area to promote the economic revitalization of that conservation area and, thus, the taking continued to serve a constitutionally permissible public use.

¶ 29                                  Analysis

¶ 30    Eychaner raises two arguments. First, he asserts the City has no right to take his property and that our ruling allowing the taking to prevent future blight was wrong and in conflict with supreme court precedent in *SWIDA*. Eychaner asks that we reverse that judgment and dismiss the eminent domain proceeding with prejudice. Alternatively, Eychaner contends the trial court erred in denying his motion to reconsider its denial of his traverse in light of the City's new North Branch Framework and asks that we reverse that denial and remand so the trial court can reconsider in light of changed circumstances.

¶ 31                         Law-of-the-Case Doctrine

¶ 32    As to Eychaner's argument that we reverse our original decision allowing the taking, the parties agree that the law-of-the-case doctrine applies; Eychaner asserts he raises the issue to preserve it for review in the Illinois Supreme Court.

¶ 33    The law-of-the-case doctrine provides that issues presented and disposed of in an earlier appeal are binding and will control in the circuit court on remand, as well as the appellate court in a later appeal, unless the facts presented differ so much as to require a different interpretation. *Bilut v. Northwestern University*, 296 Ill. App. 3d 42, 47 (1998). Absent substantially different facts, a party will not be allowed to reargue issues already decided by the appellate court. A dissatisfied party may file a petition for rehearing or petition for leave to appeal to the supreme court. *Id.* (citing *Sanders v. Shephard*, 258 Ill. App. 3d 626, 633 (1994)).

¶ 34    We addressed the constitutionality of the taking in Eychaner's initial appeal and upheld it. *Eychaner*, 2015 IL App (1st) 131833, ¶ 78. The law-of-the-case doctrine binds us to that decision, so we affirm. Because we apply the law-of-the-case doctrine, we do not address Eychaner's arguments that our 2015 decision should be reversed.

¶ 35                                    Denial of Posttrial Motion

¶ 36    Eychaner next contends the trial court erred in refusing to reconsider its 2006 denial of the traverse because the North Branch Framework has superseded the River West TIF, which this court relied on to affirm the taking. Specifically, Eychaner argues inconsistency exists between the North Branch Framework and the River West TIF and that the City no longer intends on preserving industrial uses in the area. Eychaner adds that the City wants to move industrial uses out of the area and replace them with multi-family residences. Eychaner contends that, under the North Branch Framework, the City will relocate Blommer rather than expand its campus, which constitutes a taking for private, not public, use. He considers this new evidence so conclusive that it would probably change the result on reconsideration of the denial of the traverse. Eychaner claims the trial court abused its discretion in ruling on the reconsideration.

¶ 37    We will not reverse a decision to grant or deny a motion for reconsideration absent an abuse of discretion. *Landeros v. Equity Property & Development*, 321 Ill. App. 3d 57, 65 (2001). A motion to reconsider brings to the court's attention (i) newly discovered evidence unavailable at the time of the hearing, (ii) changes in the law, or (iii) errors in the court's application of the existing law. *O'Connor v. County of Cook*, 337 Ill. App. 3d 902, 911 (2003). Illinois courts do not favor posttrial motions based on newly discovered evidence and subjects them to close scrutiny. *Robbins v. Avara*, 28 Ill. App. 3d 292, 295 (1975).

¶ 38    A motion for a new trial based on newly discovered evidence requires establishing the new evidence be (i) so conclusive it probably changes the judgment should a new trial be granted, (ii) discovered after the trial, (iii) undiscoverable "before trial with the exercise of due diligence," (iv) material to the issue, and (v) not "merely cumulative to the evidence at trial." *Lannert v. Ramirez*, 214 Ill. App. 3d 1102, 1104 (1991).

¶ 39                    Timeliness of Motion for Reconsideration

¶ 40    We agree with the trial court that Eychaner did not meet the elements required to grant a motion for reconsideration based on newly discovered evidence. Eychaner met the fourth requirement, as to materiality. But Eychaner failed to meet the other four requirements.

¶ 41    First, Eychaner failed to establish that the new evidence was discovered after trial. He knew of the "changed circumstances"—the North Branch Framework—before the second just compensation trial and had ample opportunity to bring the evidence to the court's attention. The City first publicly announced its North Branch Framework recommendations on June 6, 2016, and adopted the implementing ordinance in July 2017. Fuji publicly announced its acquisition of Blommer on November 19, 2018. As the trial court noted, some of the changes brought about by the North Branch Framework, including zoning changes that would permit mixed-use residential developments, had been presented at the just compensation jury trial. The circumstances plainly had changed; both parties were aware of it, as was the trial court. If Eychaner had filed his motion to reconsider beforehand and had prevailed, the parties and the court would have been spared the cost and time of conducting what would have been an irrelevant four-day jury trial on just compensation. Instead, Eychaner waited until after the trial to ask the court to again consider the constitutionality of the taking based on evidence available well beforehand.

¶ 42    Eychaner contends the trial court should have looked at whether the new evidence could have been discovered before the 2006 condemnation hearing rather than the second just compensation jury trial. Eychaner cites no cases to support this contention. He simply asserts that the jury only had jurisdiction over the just compensation issue and could not have decided whether the taking was constitutional under the City's new North Branch Framework. That argument fails. The trial judge, not the jury, possesses the authority to decide the constitutionality of the taking. See *City of Naperville v. Old Second National Bank of Aurora*, 327 Ill. App. 3d 734, 739 (2002) (issues raised on traverse and motion to dismiss are preliminary questions determined by trial court without jury). But nothing restrained Eychaner from bringing a motion to reconsider or for a new traverse based on the purportedly material change of circumstances, so the trial judge could have addressed it before the jury trial on just compensation. Eychaner had opportunity between July 2017, when the City adopted an implementing ordinance for the North Branch Framework, and December 2018, when the just compensation trial began, to argue that the taking was no longer constitutional. He remained silent to his detriment.

¶ 43    We also reject the contention that by remanding for a jury trial on just compensation our mandate prevented the trial court from reconsidering its denial of the traverse and motion to dismiss in light of newly discovered evidence. As the trial court noted, the law-of-the-case doctrine precludes Eychaner from rearguing issues this court decided. *Bilut*, 296 Ill. App. 3d at 47. But the doctrine applies to issues of fact or matters concerning claims decided by the appellate court, not issues of fact or matters concerning claims not decided by the appellate court. *Zokoych v. Spalding*, 84 Ill. App. 3d 661, 667 (1980). When we remanded in 2015, the city's North Branch Framework did not exist, and we could not address whether it affected the constitutionality of the taking, a

question of fact. Nothing in our remand indicated that the trial court had to blindly follow our mandate and hold a new jury trial on just compensation, undeterred by material new facts that came to light after we ruled. See *Bilut*, 296 Ill. App. 3d at 47 (despite law-of-the-case doctrine, dissatisfied party may file petition for rehearing based on new facts). Thus, Eychaner failed to timely file his motion to reconsider or show that new evidence was discovered after trial.

¶ 44    Nor can Eychaner contend the evidence was undiscoverable before the just compensation trial with the exercise of due diligence. The evidence of changed circumstances, as we have said, was known to Eychaner before trial and partly presented to the jury. Thus, he failed to satisfy the third and fifth *Lannert* requirements.

¶ 45                    Changed Circumstances Did Not Warrant Reversal

¶ 46    Even if Eychaner could meet the other *Lannert* requirements, he failed to demonstrate the new evidence would change the outcome. Eychaner notes that our decision affirming the trial court's denial of his traverse relied primarily on the City's River West TIF, which showed (i) the City had a "carefully formulated" economic development plan and (ii) the taking "unquestionably serves a public purpose of preventing blight, promoting economic revitalization, and protecting existing industry." *Eychaner*, 2015 IL App (1st) 131833 ¶ 63. Eychaner asserts that the City's decision to adopt the new North Branch Framework supersedes the River West TIF; in other words, the taking is no longer supported by the City's current economic development plan, and so it is nothing more than a naked transfer from Eychaner to Blommer in the name of economic development.

¶ 47    The North Branch Framework, however, is not the sole expression of the City's plan, and it does not supersede the River West TIF, which remains in effect. The River West TIF was enacted

by an ordinance that remains in effect, by its own terms, until 2024. Eychaner relies on what he deems "express language in the North Branch Framework stating that all prior plans are superseded." But he either purposely or erroneously misstates the language; it has nothing to do with the River West TIF. The North Branch Framework states, "At least seven plans and studies have been completed since 2010 that provide recommendations which are relevant to the North Branch Industrial Corridor and its surrounding areas." It then identifies those specific seven plans. *None* involve the River West TIF plan.

¶ 48    Moreover, the North Branch Framework and the River West TIF plan together carry out the purpose of promoting the economic revitalization of a conservation area. As the North Branch Framework states, its primary goal is to "maintain the north branch industrial corridor as an important economic engine and vital job center within the city of Chicago." It does so by "moderniz[ing] existing land use regulations in the corridor to more effectively promote economic growth and job creation through the expansion of existing businesses and the attraction of new businesses, corporate headquarters and companies that drive Chicago's knowledge-based economy," a goal consistent with that of the River West TIF to promote economic revitalization and protect existing industry.

¶ 49    Further, the area around Eychaner's property continues to qualify under the TIF Act as a conservation area that runs the risk of blighting without intervention by the City. And, as we held, the City "may use the power of eminent domain to prevent future blight in a conservation area such as the River West TIF." *Id.* ¶ 69. The City's decision to change the zoning to allow broader economic redevelopment beyond strict industrial uses does not render the plans unconstitutional. As we held, "[t]he goals of the River West TIF—to reduce blighting factors, prevent blight, foster the City's industrial base, prevent conflicts between residential and industrial uses, and retain

existing industry—all constitute valid public uses." *Id.* ¶ 75. The City's current plan to redevelop the conservation area around Eychaner's property seeks to "preserve the industrial character of the corridor while also attracting innovation and technology-oriented businesses," a valid public use.

¶ 50 Eychaner relies on *Village of Skokie v. Gianoulis*, 260 Ill. App. 3d 287 (1994), to argue that the taking was an abuse of the City's eminent domain power. In *Gianoulis*, the appellate court invalidated a taking by the Village of Skokie because the defendant's properties had not been included in the Village's original planning study or in the ordinance that originally authorized the use of eminent domain as part of a redevelopment plan. *Id.* at 296. Later, when a developer contacted the Village about an unsuccessful attempt at privately purchasing the property, the Village passed an ordinance retroactively redefining the redevelopment project area to include the defendants' properties. *Id.* This court held that the Village lacked authority to take the properties and abused its power because the properties had not been part of the redevelopment project area identified in the ordinance authorizing the use of eminent domain and "[the Village] cannot merely pass an ordinance and state therein that the lots are now included in the study and the plan." *Id.* at 297.

¶ 51 Eychaner contends that, as in *Gianoulis*, the City's decision to adopt the North Branch Framework constituted a change in policy, approach, and planning: from conserving existing industrial uses to relocating and replacing them with residential and commercial uses. We disagree. Unlike the defendants in *Gianoulis*, Eychaner's property has always been within the conservation area identified by the River West TIF; the City has always planned for the area's economic redevelopment area. As the trial court stated in distinguishing *Gianoulis*, "[h]ere there was a broad redevelopment plan implemented prior to the initial taking, and there was a broad redevelopment plan implemented at the time of the second trial. Changed circumstances in the manner of new

developments in the subject area, which warranted the City conduct a new comprehensive study to determine what zoning best would promote its intention of economic revitalization of the conservation area bolsters its public purpose, rather than show an abuse of power." See *id.*

¶ 52    Also, Eychaner presented no evidence of changes to the plan. Instead, he asserts the City's current plan no longer supports the taking. Not so. Residential uses remain prohibited under the current zoning, though the zoning went from PMD to DS. And Eychaner cites no evidence that Blommer or Fuji intends to use the property for a residential purpose or a use inconsistent with the redevelopment agreement or the River West TIF goals. Indeed, Eychaner acknowledges that both the plans for the property to become part of Blommer factory and the Blommer redevelopment agreement remain unchanged.

¶ 53    Further, the City's decision to create a fund to pay industrial businesses to relocate out of the area supports the goal of the River West TIF by reducing conflicts between residential and industrial uses. Acquiring Eychaner's property has been to allow Blommer to expand into a self-enclosed campus, thereby reducing conflicts with neighboring uses, continuing operations, and maintaining its workforce within the City—all part of the City's larger plan to redevelop and ensure the economic vitality of the area.

¶ 54    The City's plans under the River West TIF, the redevelopment agreement, and the North Branch Framework continue to "carry out the same purpose of promoting 'the economic revitalization of a conservation area." Thus, the trial court did not abuse its discretion in denying the motion to reconsider.

¶ 55    Affirmed.

**No. 1-19-1053**

| | |
|---|---|
| **Cite as:** | *City of Chicago v. Eychaner*, 2020 IL App (1st) 191053 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 05-L-5792; the Hon. Rita M. Novak and the Hon. James M. McGing, Judges, presiding. |
| **Attorneys for Appellant:** | Thomas F. Geselbracht and Elizabeth L. Butler, of DLA Piper LLP (US), of Chicago, for appellant. |
| **Attorneys for Appellee:** | Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Justin A. Houppert, Assistant Corporation Counsel, of counsel), for appellee. |