# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *City of Chicago v. Eychaner*, 2015 IL App (1st) 131833

</div>

| | |
|---|---|
| Appellate Court Caption | THE CITY OF CHICAGO, a Municipal Corporation, Plaintiff-Appellee, v. FRED J. EYCHANER, Defendant-Appellant (Unknown Others, Defendants). |
| District & No. | First District, Third Division<br>Docket No. 1-13-1833 |
| Filed | January 21, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from plaintiff city's exercise of its power of eminent domain to take defendant's property and transfer it to a nearby chocolate factory where defendant challenged the taking was unconstitutional by filing a traverse and motion to dismiss, which were denied by the trial court, and the jury valued the property at $2.5 million after a trial on just compensation, the appellate court held that the city could use eminent domain to take property in a conservation area to prevent future blight and that the trial court erred in refusing to exclude any reference to the land's planned manufacturing district zoning, but it declined to address the relevancy of how and why the zoning district came about; further, the court also held that defendant was not prejudiced when the city called witnesses defendant had formerly retained but chose not to call at trial, that the trial court erred in limiting the testimony of an appraiser defendant had originally retained when the appraiser was called by the city, and that the curative instruction given by the trial court relieved defendant of any prejudice from the revelation that the appraiser who testified for the city was originally retained by defendant, and therefore, the judgment was affirmed in part, reversed in part and remanded for a new trial on just compensation. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-050792; the Hon. Rita M. Novak and the Hon. Margaret A. Brennan, Judges, presiding. |
| Judgment | Affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | Thomas Geselbracht, of DLA Piper LLP, of Chicago, for appellant. |
| | Stephen R. Patton, Corporation Counsel, of Chicago (Myriam Kasper and Justin A. Houppert, Assistant Corporation Counsel, of counsel), for appellee. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Lavin concurred in the judgment and opinion. |

## OPINION

¶ 1 The plaintiff City of Chicago (City) exercised its power of eminent domain to take defendant Fred Eychaner's property and transfer it to the Blommer Chocolate Company. Eychaner filed a traverse and motion to dismiss, challenging the taking as unconstitutional, which the trial court denied. After a trial on just compensation, a jury valued Eychaner's land at $2.5 million.

¶ 2 Eychaner appeals, arguing: (i) the City may not use eminent domain to take property in a conservation area in the name of economic redevelopment; (ii) the trial court should have granted Eychaner's motion *in limine* to bar reference to the property's planned manufacturing district (PMD) zoning; (iii) the trial court erred in excluding evidence of how and why the City included Eychaner's land in the PMD because it was relevant to the issue of whether there was a reasonable probability of rezoning; (iv) the City should not have been allowed to add new appraisers that Eychaner had originally retained; (v) the trial court should have allowed appraiser Michael MaRous to testify regarding his opinion that there was a reasonable probability of rezoning; (vi) the trial court should have stricken MaRous's testimony for violating the court's *in limine* order when he identified Eychaner as his original employer; and (vii) the jury's $2.5 million verdict was the result of a mistaken belief that there was no reasonable probability of rezoning.

¶ 3 We affirm in part and reverse in part, holding: (i) under long-standing precedent, the City may use eminent domain to take property in a conservation area to prevent future blight; (ii) the trial court erred in refusing to exclude reference to the land's PMD zoning, and having so

held, (iii) we decline to address the relevancy of how and why the PMD zoning came about; (iv) Eychaner was not prejudiced when the City chose to call witnesses he had formerly retained but had chosen not to call at trial; (v) the trial court erred in limiting MaRous's testimony; and (vi) because of the trial court's curative instruction, no prejudice arose from MaRous's identifying Eychaner as his original employer. Accordingly, we reverse and remand for a new trial on just compensation.

¶ 4 BACKGROUND

¶ 5 Eychaner's Property and Rezoning to PMD

¶ 6 Eychaner owned vacant land at the southwest corner of West Grand Avenue and North Jefferson Street (labeled "Eychaner's Land," *infra* figure 1). Two blocks south of Eychaner's land stood the Blommer Chocolate Company's Chicago factory at the corner of North DesPlaines Street and West Kinzie Street (labeled "Blommer's Factory," *infra* figure 1).



Figure 1.

- 3 -

¶ 7    At the end of 1999, the City proposed the creation of a PMD in the Chicago-Halsted corridor (shaded area in the map, *infra* figure 2, "Eychaner" and "Blommer" labels added), aimed at protecting the 2,800 industrial jobs located in the area, preventing residential encroachment on the existing manufacturing facilities, and encouraging manufacturers to invest in their facilities.



Figure 2.

¶ 8    The City's municipal code lists five goals behind the creation of PMDs, to: (i) "foster the city's industrial base"; (ii) "maintain the city's diversified economy for the general welfare of its citizens"; (iii) "strengthen existing manufacturing areas that are suitable in size, location and character and which the City Council deems may benefit from designation as a PMD"; (iv) "encourage industrial investment, modernization, and expansion by providing for stable and predictable industrial environments"; and (v) "help plan and direct programs and initiatives to promote growth and development of the city's industrial employment base." Chicago Municipal Code § 17-6-0401-A (amended Sept. 10, 2014). Residential uses are not

permitted within PMDs. See Chicago Municipal Code §§ 17-6-0403-C, 17-6-0403-F (amended Sept. 10, 2014).

¶ 9 The proposed area for the PMD contained nine industrial firms, including the Blommer Chocolate Company's factory, which was located at the southern most part of the PMD. In January 2000, the City held a public meeting regarding the PMD. At the meeting, the area's alderman noted that there had been increasing conflicts between the residential tenants and the area's existing industry, including complaints about heavy truck traffic at all hours of the day. At the meeting, the City also mentioned that, later in the year, it would conduct an eligibility study for the creation of a tax-increment financing (TIF) district under the Tax Increment Allocation Redevelopment Act. 65 ILCS 5/11-74.4-1 *et seq.* (West 2004). At the meeting, the City described Eychaner's land as one of the "two largest sites [in the proposed PMD] that aren't being used as the present time" and a potential development site.

¶ 10 Blommer also attended the January 2000 meeting and raised concerns about a proposed residential development by CMC Heartland on the other side Kinzie Street, just south of Blommer's factory and just outside the proposed boundaries of the PMD. Blommer noted that there was no buffer zone between itself and the proposed residential development, creating a potential for conflict.

¶ 11 In February 2000, Blommer wrote a letter to the City, objecting to its inclusion in the PMD. Blommer's letter noted that "the purpose of the PMD was to protect manufacturing businesses from residential development," but the inclusion of Blommer did not fulfill that purpose. Blommer did not show any interest in Eychaner's land in the letter.

¶ 12 Blommer primarily objected to its inclusion in the PMD because "the vacant land directly South of Blommer [was] scheduled for massive residential development by CMC. Unless the boundary of the PMD was extended to include the CMC property (South of Kinzie and North of the railroad track), there would be no buffer between the heavy industrial use of Blommer's property and the residential development being proposed by CMC." Blommer took the position that "rather than fight the CMC development, it would be more productive to work together with CMC to find ways to make Blommer's operation more compatible to neighboring residential usage." Citing three sources of conflict–smell, noise, and traffic–Blommer noted that it had already made plans to minimize complaints about the smell of cocoa bean roasting and plant noise. As to traffic, Blommer, working with the CMC, wanted to acquire the vacant land and parking lot to the east of its factory to use as a staging area for trucks and alleviate truck congestion on DesPlaines and Kinzie Streets. Blommer also proposed vacating the sections of Hubbard and Jefferson Streets adjacent to its plant.

¶ 13 But even with its plan to reduce the smell, noise, and traffic associated with its operation, Blommer raised the specter that residents would still find its manufacturing operations "intolerable." If that were the case, the best solution for Blommer would be to relocate, and if forced to move, Blommer noted, "it is hard to imagine another manufacturing concern would be interested in buying our property only to inherit our neighborhood problems." Blommer concluded that, if it were forced to sell, "not being included in the PMD would provide us with some flexibility in finding another use for the property."

¶ 14 The City's plan commission (Plan Commission) held another meeting on the PMD in March 2000. There, a representative from the City's department of planning and development noted that the PMD would send a message to developers that this area was to remain primarily industrial and commercial, and that the PMD would prevent residential

- 5 -

development on vacant parcels within its boundaries. At that meeting, Blommer opposed its inclusion in the PMD, repeating the reasons stated in its February 2000 letter. Blommer proposed two solutions: expand the PMD to extend south of Kinzie Street, preventing the residential development, or exclude Blommer from the PMD so that it could sell its land if conflicts arose with the future residents. Members of the Plan Commission expressed a desire to keep Blommer in Chicago. In light of Blommer's and others' objections, the Plan Commission deferred voting to approve the PMD.

¶ 15　　In late March 2000, Blommer met with the City regarding its concerns about its inclusion in the PMD. To minimize the impact of nearby residential development, Blommer asked the City to assist it in increasing the size of its industrial campus to create more places for off-street truck staging. Blommer proposed acquiring the land to the north and east of its current factory, and then walling off the expanded campus. This expansion would mitigate neighbors' complaints about noise and trucks. Drawings of Blommer's proposed expansion did not include Eychaner's land (outlined below, *infra* figure 3, "Eychaner" label added). At the meeting, the City noted that it was conducting an eligibility study for a tax-increment financing district and that Blommer could use the financing to acquire land for its expansion and improve the infrastructure.



Figure 3.

¶ 16    In April 2000, the commissioner of the City's Plan Commission wrote a letter to Blommer expressing "[w]e are committed to keeping quality manufacturing firms, such as [Blommer] in the City. To that end, we are very interested in helping your create a larger 'industrial campus' as a means to internalize your loading operations, limit traffic impacts on adjacent streets, and provide room to expand." The commissioner wrote that the Plan Commission would: (i) work on the possibility of closing parts of Hubbard Street and Jefferson Street; (ii) pursue the creation of a tax-increment finance district to finance public infrastructure improvements and "any potential acquisitions," which now included Eychaner's land; and (iii) defer approval of residential development south of Blommer's plant "to explore design, use and density issues." The PMD, the commissioner noted, would "ensure that properties to the north and east of [Blommer's] factory are not developed for residential use," and also made clear that Blommer's "public support for this action [was] crucial in getting this measure through the legislative process."

¶ 17    In May 2000, Blommer commissioned an architect to draw up a site plan for its expanded campus. That plan included Eychaner's land (*infra* figure 4, "Eychaner" and "Blommer" labels added). In June 2000, Blommer wrote another letter to the commissioner of the City's Plan Commission, summarizing its position on the PMD and CMC's proposed residential development south of Kinzie Street. Blommer laid out the plan for its expanded industrial campus, outlining a nine-step process for the expansion, including: (i) the City, Blommer, and CMC would execute a redevelopment agreement; (ii) the City would acquire three parcels of land, one of which Eychaner owned, that the City would then transfer to Blommer for $1; and (iii) the City would put in place a tax-increment finance district to help fund the expansion. Blommer also noted that "[a] binding Redevelopment Agreement would have to be approved by the City and fully executed before Blommer could fully support the PMD and the rezoning of the CMC development" for residential use.

¶ 18    Blommer's position did not sit well with the City. In a July 2000 memorandum to the mayor, the City wrote that "Blommer's seems to be negotiating as if they have us over [a] barrel." The memorandum recommended proceeding with the creation of the PMD while continuing to negotiate with Blommer, also noting, "Blommer's will go public with its concerns. The only other option is to change the boundaries to exclude them. That will create a slippery slope for all the others who want out of the PMD."

¶ 19    In August 2000, the Plan Commission held another meeting. At the meeting, in an effort to minimize conflicts between its future residents and Blommer, CMC Heartland proposed a 1-acre, 25-foot setback for its residential development on Kinzie Street. Blommer withdrew its opposition to its inclusion in the PMD based on the City's willingness to help expand Blommer's industrial campus and "create a buffer" between its operations and CMC's proposed residential development. In expanding the industrial campus, Blommer could move its truck staging off of DesPlaines and Kinzie, alleviating complaints about traffic and noise. The Plan Commission recommended the city council approve the PMD.

¶ 20    In September 2000, the city council passed an ordinance adopting the PMD. The City made five findings. First, it is City policy to "foster the growth of the City's manufacturing and commercial base to maintain a diversified economy." Second, the City "is committed to the retention of exiting manufacturing and commercial firms and the development of modern facilities." Third, the area designated as the PMD is "directly adjacent to the North Branch industrial Corridor and shares many of" the corridor's industrial characteristics. Fourth, the

proposed PMD has "an active manufacturing and commercial base, expansion opportunities, excellent locational advantages and sufficient infrastructure. Fifth," "[c]ontinued manufacturing and commercial investment, modernization and expansion depends on a stable and predictable land-use environment." The ordinance then lists the purpose of the PMD as intending "to accommodate manufacturing, commercial and entertainment uses with an emphasis on office, night-time entertainment, high tech service and sales, arts-oriented retail and the retention/expansion of existing manufacturing and distribution facilities."

¶ 21   That same month, the City's community development commission accepted for review the proposed plan for the River West Tax Increment Financing Redevelopment Project Area (River West TIF). The proposed plan encompassed land on the west side of the Chicago River (outlined in picture, *infra* figure 5, "Eychaner" and "Blommer" labels added), and included both Blommer's factory and Eychaner's land. It also included part, but not all, of the PMD (both areas mapped, *supra* figure 2).



Figure 5.

¶ 22   As a part of the plan for the proposed River West TIF, the City retained a private firm that conducted an eligibility study and drafted a 68-page report. The proposed plan sought "to respon[d] to a number of problems and needs within the [River West TIF] Project Area,

and *** to maintain and revitalize the Project Area as a viable support area for" the Loop. The study noted that the areas around Chicago's Loop

> "are currently enjoying a residential renaissance as thousands of new and returning residents discover the convenience and vibrancy of living downtown. To satisfy the demand for new housing units, developers have begun rehabilitating old industrial buildings and constructing new residential buildings around the Project Area. The inherent incompatibility between new residents and existing industry and commercial businesses can force these industries and commercial businesses out of the area. The rise in land values and property taxes, the incentive to sell to high-bidding residential developers, and the increase in complaints from neighboring residential developments, all work to push industrial and commercial users out.
>
> The City of Chicago has recognized, however, that it is critical to the overall land-use balance, and to the employment and tax base of the City, to protect and enhance the remaining industrial areas already in proximity to the Loop."

In support of these policies, the report notes that the City created the Chicago-Halsted PMD and that the River West TIF is one of the City's tools that "is intended to provide the financial mechanism necessary to implement the goals and objective of" the PMD.

¶ 23 Regarding the PMD, the River West TIF study described the need for buffer zones between industrial and residential uses to "limit off-site impacts such as noise and vibration" and "to prevent conflicts between incompatible uses." It also noted that "demand for new or additional facilities by existing industry is expected to become important in the future."

¶ 24 The proposed area for the River West TIF consisted of 124 acres with 103 buildings and 105 vacant or parking lot parcels. The usage within the River West TIF included: 15.1% industrial, 7.8% commercial, 1.4% mixed-use residential, and 0.7% multifamily residential. The remaining uses fell into the categories of institutional, parking, vacant, railroad, and other right-of-way.

¶ 25 The study found that tax-increment financing would induce private investment and arrest blighting factors in the area. Because the area had not been subject to growth and reinvestment, the study reasoned that property owners would not invest in their properties without tax-increment financing. The study anticipated benefits, including: (i) stronger economic vitality; (ii) increased construction and long-term employment opportunities; (iii) replacement of inappropriate uses, blight, and vacant properties with viable, high-quality developments; (iv) the elimination of physical impediments, such as roads in poor condition; (v) the construction of public improvements to attract private investment; (vi) job-training services to make the area more attractive to investors and employers; and (vii) opportunities for minority- and women-owned businesses to share in the redevelopment.

¶ 26 The study also documented the conditions of the buildings within the area. According to the study, 88% of the buildings were 35 years old or older, and the area met the statutory definitions for the following blighting factors: deterioration, code violations, excessive vacancies, lack of community planning, and lagging property values. The proposed plan concluded that it met the requirements of a "conservation area" under the Tax Increment Allocation Redevelopment Act (65 ILCS 5/11-74.4-1 *et seq.* (West 2004)).

¶ 27 Moreover, the study set forth several goals and objectives for the River West TIF, including: (i) "reduction or elimination of those conditions which qualify the Project Area as

a conservation area"; (ii) "provision of sound economic development in the Project Area, particularly by strengthening the viability, function, and cohesiveness of industrial and commercial development"; (iii) employment of local residents; (iv) the creation of strong public-private partnerships; (v) improved utilities, roadways, transit facilities, and infrastructure; (vi) improved quality of life in the City; (vii) fostering an environment to benefit the health, safety, and general welfare of City residents, and that will enhance property values and stimulate private investment; and (viii) the preservation of historic buildings.

¶ 28    The study lists 15 strategies to induce redevelopment: (i) encouraging "maintenance and expansion of sound and viable industrial and commercial uses in appropriate locations"; (ii) permitting "residential development only where such development imposes the minimum adverse impact upon the existing industrial and commercial base"; (iii) rehabilitating and modernizing existing industrial and commercial structures for continued use; (iv) assembling parcels into shapes appropriate for modern development; (v) upgrading infrastructure; (vi) create buffers between incompatible uses; (vii) recruiting new enterprises to fill vacant structures; (viii) studying existing and future traffic conditions; (ix) improving parking; (x) enhancing visual character with building rehabilitation and right-of-way improvements; (xi) undertaking environmental rehabilitation; (xii) preventing any adverse environmental impact to the Chicago River; (xiii) promoting energy efficient development; (xiv) establishing job-readiness and job-training programs and having area employers commit to interviewing those trainees; and (xv) providing opportunities for women- and minority-owned businesses.

¶ 29    The River West TIF plan cited one parcel of land for acquisition by the City under the Act, but this was not Eychaner's land. The total estimated redevelopment costs for the River West TIF were $150 million. The estimated date of completion of the redevelopment project was "no later than December 31, 2023."

¶ 30    In January 2001, the community development commission recommended the city council adopt the plan for the River West TIF. The city council passed an ordinance that adopted the River West TIF plan soon thereafter, finding that, as a conservation area, the area "may become a blighted area."

¶ 31    In May 2001, Blommer submitted a redevelopment proposal to the City regarding its expanded campus. Blommer proposed acquiring 4.2 acres of land surrounding its factory, which included Eychaner's land. Its proposal noted that Blommer's expanded campus would create and retain jobs at its plant, increase tax revenue for the City, ensure that Blommer stayed in Chicago, and create a "buffer zone" between Blommer's factory and residential development.

¶ 32    In February 2002, Blommer offered to purchase Eychaner's land for $824,980. Eychaner refused to sell. In April 2002, the City notified Eychaner that it was considering taking his property. The City's community development commission held a public meeting regarding the proposed taking in May 2002. Eychaner's counsel attended the meeting and objected to the City's actions. The commission nevertheless recommended acquiring Eychaner's and others' property via eminent domain. In June 2002, the city council passed an ordinance authorizing the taking of Eychaner's land, finding the taking necessary to achieve the objectives of the River West TIF plan, noting "[t]he Plan and the use of tax increment financing provide a mechanism to support new growth through leveraging private

investment, and helping to finance land acquisition, demolition, remediation, site preparation and infrastructure for new development in the Area."

¶ 33    In February 2006, the city council passed an ordinance appointing Blommer as the project developer for the acquired properties and authorizing a redevelopment agreement between Blommer and the City.

¶ 34                              Condemnation Proceedings

¶ 35    In August 2005, the City filed a complaint to condemn Eychaner's property through eminent domain. In January 2006, Eychaner filed a traverse and motion to dismiss, arguing that the City's exercise of eminent domain was *prima facie* unconstitutional and that the trial court should dismiss the complaint.

¶ 36    The trial court denied Eychaner's traverse in August 2006. On Eychaner's motion, the trial judge certified that order for interlocutory appeal on the question of whether the City could use its eminent domain powers to take property that is neither blighted nor a slum and give it to a private party in the name of economic redevelopment. This court denied Eychaner's petition for leave to appeal and remanded the case, which proceeded to a jury trial on just compensation.

¶ 37    Before trial, Eychaner moved *in limine* to bar reference to the land's PMD zoning. Eychaner argued that under the "project influence rule," the valuation should not take into account the PMD zoning. The trial judge denied that motion. The City filed a motion *in limine* to bar evidence that it intends to transfer the land to Blommer, which the trial court granted.

¶ 38    Eychaner disclosed four expert witnesses under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007): Joseph Thouvenell, Michael MaRous, Allen Kracower, and Dale Kleszynski. But in his witness list before trial, Eychaner decided not to call two of his experts: MaRous and Thouvenell. The City then supplemented its Rule 213(f) disclosures to add MaRous and Thouvenell as its own witnesses. Eychaner moved to strike those disclosures as untimely, which the trial court denied. The City then moved *in limine* to bar Eychaner from cross-examining his abandoned witnesses on opinions the City did not elicit on direct examination, which the trial court granted. It also granted Eychaner's motion *in limine* to bar evidence that he previously retained MaRous and Thouvenell.

¶ 39    At trial, during the City's case-in-chief, it called three real estate appraisal expert witnesses. First, Kathy Dart opined rezoning was not a reasonable probability. She based this conclusion on Chicago's 13 PMDs, not one of which has a residential use in it. No one has rezoned any land in a PMD for residential use. They are strictly industrial and commercial areas. She also noted that residential use would not meet the objectives of a PMD. Dart stated that the highest and best use of the land was for light industrial and commercial uses, consistent with the PMD zoning. Dart appraised the property at $1.53 million. Another appraiser, James Gibbons, testified similarly: that it was not reasonably probable to assume that land in a PMD could be rezoned for residential use. He appraised Eychaner's land at $1.4 million.

¶ 40    The City then called MaRous, who did not testify whether there was a reasonable probability of rezoning, but valued the land at $2.55 million assuming the land's PMD

zoning, which he described on cross-examination as an "extraordinary assumption." MaRous also testified as follows on redirect examination:

> "Q. [City's attorney:] And then he [opposing counsel] also mentioned that you do work for corporations, correct?
>
> A. Yes.
>
> Q. And a corporation did not hire you to appraise the subject property in this case, did they?
>
> A. It may have been one of Mr. Eychaner's corporations. I don't recall.
>
> Q. Well–
>
> MR. GESELBRACHT [Eychaner's attorney]: Objection, [Y]our Honor.
>
> THE COURT: Sustained. Move to strike[?]
>
> MR. GESELBRACHT: Move to strike.
>
> THE WITNESS: Okay.
>
> THE COURT: That answer will be stricken."

Eychaner requested a sidebar and moved to strike all of MaRous's testimony for violating the trial court's *in limine* order. Alternatively, Eychaner argued that the trial court should permit him to re-cross-examine MaRous on his opinions not covered on the City's direct examination. As a second alternative, Eychaner requested a curative instruction. The court denied Eychaner's motions, but did instruct the jurors "not to concern themselves with who may have requested Mr. MaRous to perform an appraisal of the subject property."

¶ 41 In Eychaner's case-in-chief, he called Allen Kracower as a land planning expert. Kracower testified that the highest and best use for the land was as a "multiple family residential" use. As to the reasonable probably of rezoning, Kracower opined that "it was reasonably probable *** to have the property rezoned" to allow "a multiple family higher-rise type structure." He based this opinion on the rezoning of 13 acres of nearby land outside of the PMD that was originally zoned for industrial use and was rezoned in 1972 and 2002 for residential use: Kinzie Park and Kinzie Station. These rezonings, Kracower stated, showed that the industrial zoning designation was flexible. He also noted that the surrounding area is becoming increasingly residential to the east and south even though industrial firms once dominated it. In Kracower's opinion, dense urban areas are not suited for manufacturing, since such use requires an abundance of land and unclogged trucking routes. Regarding PMDs generally, Kracower opined that the PMD was an out-of-date classification since it has not stopped manufacturing from leaving the City. He also said there were no residential uses in PMDs simply because no one had asked for such a rezoning.

¶ 42 Eychaner then called Dale Kleszynski as an expert real estate appraiser. Kleszynski opined that there was a reasonable probability of rezoning and that the highest and best use of the land was as a residential high rise. He noted many properties in the area, especially on the east side of the Chicago River, had transitioned from industrial to residential. Kleszynski valued the land at $5.1 million. On cross-examination, however, Kleszynski revealed that, for valuation purposes, he did not compare Eychaner's land to land in other PMDs. He also could not cite a single instance of a residential use in any PMD.

¶ 43 Eychaner also called Nora Curry, a financial planning analyst with the City's department of housing and economic development. Curry testified about the nature and purpose of PMDs to create stable areas of industry.

¶ 44     In its rebuttal case, the City called Thouvenell, who valued the land at $3.6 million and stated that its highest and best use was as multifamily residential use. He testified to a reasonable probability of rezoning for multifamily residential use. He admitted that in the City's 13 PMDs, there were no residential uses, and he relied on other nearby properties that have been rezoned from industrial to residential classifications.

¶ 45     The City then called Lawrence Okrent, an expert land planner, who testified that there was no reasonable probability of rezoning Eychaner's property. He looked at zoning trends in the area dating back to the 1920s. He opined that the creation of this PMD was consistent with land use trends in the area. Okrent disagreed with Kracower regarding the meaningfulness of nearby residential development. He distinguished Eychaner's property from others because it was in the middle of the PMD, making it an unlikely candidate for residential rezoning. For the city council to adopt residential zoning for Eychaner's land, he testified, would be careless, and the highest and best use of the land was for light industrial and commercial uses, consistent with the PMD zoning.

¶ 46     The jury returned a verdict of $2.5 million. Eychaner appeals.

¶ 47                              ANALYSIS

¶ 48     Eychaner raises seven issues on appeal regarding both the traverse and the trial on just compensation. We find no constitutional error, but reverse for a new trial on just compensation.

¶ 49              Eminent Domain in a Conservation Area

¶ 50     Eychaner argues that the City may not exercise the power of eminent domain in a conservation area in the name of economic redevelopment. We disagree. We review the constitutionality of a taking *de novo*. *Southwestern Illinois Development Authority v. Al-Muhajirum*, 318 Ill. App. 3d 1005, 1008 (2001).

¶ 51     Condemnation, or eminent domain, is the process by which the government takes private property for public purposes subject to payment of just compensation. *Village of Bellwood v. American National Bank & Trust Co. of Chicago*, 2011 IL App (1st) 093115, ¶ 18. The Illinois Constitution and the United States Constitution prohibit the taking of private property for a public purpose without payment. Ill. Const. 1970, art. I, § 15; U.S. Const., amend. V. While the power and right of eminent domain are indeed vast, they are heavily regulated by legislation. *Department of Public Works & Buildings v. Kirkendall*, 415 Ill. 214, 218 (1953).

¶ 52     The government's exercise of eminent domain must be for some public purpose. *City of Chicago v. Barnes*, 30 Ill. 2d 255, 257 (1964). Nevertheless "private persons may ultimately acquire ownership of property arising out of a taking and the subsequent transfer to private ownership does not by itself defeat the public purpose." *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 199 Ill. 2d 225, 235 (2002) (*SWIDA*). Moreover, "possessory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain." *People ex rel. Gutknecht v. City of Chicago*, 3 Ill. 2d 539, 545 (1954).

¶ 53     Eychaner argues the City's taking is unconstitutional, lacking a public purpose under *SWIDA*, 199 Ill. 2d 225. Eychaner mischaracterizes *SWIDA*, arguing that the City cannot use eminent domain to transfer property from one party to another unless the property is blighted.

But *SWIDA* focuses on the motive behind the taking, and does not support Eychaner's position.

In *SWIDA*, the Southwestern Illinois Development Authority (SWIDA) sought to exercise its eminent domain powers to take 148.5 acres of land belonging to a recycling company and transfer it to a racetrack for use as a parking lot. *Id.* at 228-29. SWIDA cited less traffic, better public safety, economic benefits, and the reduction of blight as the public purposes of the taking, but conducted no study and had no economic plan to support these findings. *Id.* at 232-33. The trial court approved the taking as constitutional, but the supreme court reversed. *Id.* at 227. *SWIDA* permits a government to take property in the name of economic redevelopment as long as members of the public are the primary intended beneficiaries of the taking rather than private businesses. *Id.* at 240.

The supreme court established no "bright-line test" or set of factors to distinguish public versus private beneficiaries. *Id.* Rather, the court noted that the facts–significantly, a lack of a parking study or economic plan–showed this was a sweetheart deal, and that SWIDA did not intend to benefit the public at all:

> "While the activities here were undertaken in the guise of carrying out its legislated mission, SWIDA's true intentions were not clothed in an independent, legitimate governmental decision to further a planned public use. SWIDA did not conduct or commission *a thorough study* of the parking situation at Gateway. Nor did it formulate any *economic plan* requiring additional parking at the racetrack. SWIDA advertised that, for a fee, it would condemn land at the request of 'private developers' for the 'private use' of developers. In addition, SWIDA entered into a contract with [the racetrack] to condemn whatever land 'may be desired *** by [the racetrack].' Clearly, the foundation of this taking is *rooted not in the economic and planning process* with which SWIDA has been charged. Rather, this action was undertaken solely in response to Gateway's expansion goals and its failure to accomplish those goals through purchasing [the recycling center's] land at an acceptable negotiated price. It appears SWIDA's true intentions were to act as a default broker of land for Gateway's proposed parking plan." (Emphases added.) *Id.* at 240-41.

This court commented in *dicta* on *SWIDA* in *City of Chicago v. Midland Smelting Co.*, 385 Ill. App. 3d 945 (2008). We noted that *SWIDA* did not stand for the proposition that takings in the name of economic redevelopment required a right of public access to the taken property. *Id.* at 971. Rather, " 'possessory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain.' " *Id.* at 973 (quoting *People ex rel. Gutknecht v. City of Chicago*, 3 Ill. 2d 539, 544-45 (1954)). Instead, the *SWIDA* court "focused on the motives behind the taking and whether the taking was in fact intended to benefit the public or, rather, to benefit purely private interests." *Id.* at 971-72.

*SWIDA* does not stand for the proposition, as Eychaner urges, that a taking in a conservation area is unconstitutional. In *People ex rel. Gutknecht v. City of Chicago*, 3 Ill. 2d 539 (1954), and *Kelo v. City of New London, Connecticut*, 545 U.S. 469 (2005), the Illinois Supreme Court and United States Supreme Court held these takings constitutional.

In *Gutknecht*, the Illinois Supreme Court dealt with the constitutionality of a taking in a conservation area under the Urban Community Conservation Act (Ill. Rev. Stat. 1953, ch. 67½, ¶ 91.8 *et seq.*). *Gutknecht*, 3 Ill. 2d at 541. That statute defined "conservation areas," like the statute here, as those areas "likely to become slum and blighted areas if their

deterioration is not arrested." *Id.* at 542. The statute called for the creation of "municipal community conservation boards" to designate areas as conservation areas, and, after investigations and hearings, to adopt conservation plans to prevent the areas from becoming blighted. *Id.* If the board adopted a conservation plan, it could take land through eminent domain when appropriate to the plan's implementation. *Id.* at 543.

¶ 59　　　The plaintiff in *Gutknecht* challenged the validity of these takings. It argued that because the statute allowed properties acquired through eminent domain to be transferred to private developers in accordance with a conservation plan, the taking had no public purpose. *Id.* at 544. Eychaner makes the same argument. Our supreme court roundly rejected that position, holding "[w]hen such areas have been reclaimed and the redevelopment achieved, the public purpose has been fully accomplished." (Internal quotation marks omitted.) *Id.* at 545.

¶ 60　　　Nor was it fatal that the *Gutknecht* takings were done to prevent blight rather than eliminate it (another of Eychaner's arguments). Rejecting this position, the court said it knew of no constitutional principle requiring a government to deal with blight only after "it has reached its maximum development." *Id.* The court also rejected the argument that the use of eminent domain to prevent slums would mean every piece of property potentially could be condemned. *Id.* "Legitimate use of governmental power is not prohibited because of the possibility that the power may be abused." *Id.*

¶ 61　　　Similarly, the United States Supreme Court in *Kelo v. City of New London, Connecticut*, 545 U.S. 469 (2005), found no issue with this kind of taking. There, a state-sanctioned nonprofit created a development plan to revitalize an economically distressed portion of the city. *Id.* at 472-74. Part of that plan included the acquisition of 115 privately owned properties for use as a conference center hotel among other commercial and recreational uses. *Id.* at 474. Many of the individual properties were not blighted, but were condemned only because they were located in the planned development area. *Id.* at 475.

¶ 62　　　Addressing the same arguments, the court rejected the condemnees' position on the constitution's public use mandate, holding the fifth amendment's public use requirement did not require the public actually be able to use the taken land. *Id.* at 479. Rather, "it embraced the broader and more natural interpretation of public use as 'public purpose.' " *Id.* at 480. That interpretation granted great deference to state legislatures to determine "what public needs justify the use of the takings power." *Id.* at 483. Thus, the court reasoned that the plan the city set forth–to revitalize a distressed area–satisfied the public use requirement:

> "The City has *carefully formulated an economic development plan* that it believes will provide appreciable benefits to the community, including–but by no means limited to–new jobs and increased tax revenue. *** To effectuate this plan, the City has invoked a state statute that specifically authorizes the use of eminent domain to promote economic development. *Given the comprehensive character of the plan*, the thorough deliberation that preceded its adoption, and the limited scope of our review, it is appropriate for us *** to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the *entire* plan. *Because that plan unquestionably serves a public purpose*, the takings challenged here satisfy the public use requirement of the Fifth Amendment." (Emphases added.) *Id.* at 483-84.

¶ 63　　　Guided by *SWIDA*, *Gutknecht*, and *Kelo*, we turn to the City's taking and hold that it unquestionably serves a public purpose of preventing blight, promoting economic

- 15 -

revitalization, and protecting existing industry. As the City noted at oral argument, the public purpose of the PMD and River West TIF was "to make this whole area work for everyone."

¶ 64    We begin with the authority under which the City exercised the taking. See *Lake Louise Improvement Ass'n v. Multimedia Cablevision of Oak Lawn, Inc.*, 157 Ill. App. 3d 713, 716 (1987) ("the question of whether a particular taking authorized by a legislative enactment should not be construed constitutionally without a complete inquiry into the substance of the legislation and its ultimate purpose").

¶ 65    The City took Eychaner's property under the Tax Increment Allocation Redevelopment Act (Act) (65 ILCS 5/11-74.4-1 *et seq.* (West 2004)), which allows municipalities to use eminent domain within a "redevelopment project area *** to achieve the objectives of the redevelopment plan and project" (65 ILCS 5/11-74.4-4(c) (West 2004)). A "redevelopment plan" is a program "to reduce or eliminate" conditions that cause the area to be labeled as a "blighted area," a "conservation area," or an "industrial park conservation area." (Internal quotation marks omitted.) 65 ILCS 5/11-74.4-3(n) (West 2004). In addition to eminent domain, a municipality may acquire and dispose of property in any number of ways to further a redevelopment plan. See 65 ILCS 5/11-74.4-4(c) (West 2004) ("A municipality may *** acquire by purchase, donation, lease or eminent domain; own, convey, lease, mortgage or dispose of land and other property, real or personal, or rights or interests therein, and grant or acquire licenses, easements and options with respect thereto, all in the manner and at such price the municipality determines is reasonably necessary to achieve the objectives of the redevelopment plan and project.").

¶ 66    Under the Act, an improved area is considered "blighted" where "buildings or improvements are detrimental to the public safety, health, or welfare because of a combination of *5 or more*" blighting factors distributed throughout the area, including: dilapidated, obsolescent, or deteriorated buildings; code violations; illegal uses; excessive vacancies; lack of ventilation, light, or sanitary facilities; inadequate utilities; excessive or deleterious land use; the need for environmental remediation; lack of community planning; and declining land values. (Emphasis added.) See 65 ILCS 5/11-74.4-3(a)(1)(A)-(M) (West 2004).

¶ 67    Similarly, an improved area is considered a "conservation area" where "50% or more of the structures" are 35 years old or older, and the "area is not yet a blighted area but because of a combination of *3 or more* of" the above blighting factors, the "area may become a blighted area." (Emphasis added.) See 65 ILCS 5/11-74.4-3(b)(1)-(13) (West 2004). (The blighting factors for a "blighted area" and a "conservation area" are, for the most part, identical. The differences between the factors are either insubstantial or irrelevant. Compare 65 ILCS 5/11-74.4-3(a)(1)(G) (West 2004), and 65 ILCS 5/11-74.4-3(b)(7) (West 2004); compare 65 ILCS 5/11-74.4-3(a)(1)(M) (West 2004), and 65 ILCS 5/11-74.4-3(b)(13) (West 2004).)

¶ 68    The Act's definition of a "conservation area" is similar to the term's definition in the Urban Community Conservation Act, the statute at issue in *Gutknecht*, 3 Ill. 2d at 541. In the Act's legislative findings, the General Assembly noted that "conservation areas are rapidly deteriorating and declining and may soon become blighted areas if their decline is not checked." 65 ILCS 5/11-74.4-2(a) (West 2004). The legislature further found that the presence of blighting factors in a conservation area endangers the area's "stable economic and physical development." *Id*. "[T]o remove and alleviate adverse conditions it is necessary

to encourage private investment and restore and enhance the tax base of the taxing districts in such areas by the development or redevelopment of project areas." 65 ILCS 5/11-74.4-2(b) (West 2004). Redevelopment projects that eliminate blighting factors from conservation areas are, as the legislature found, "essential to the public interest." *Id*.

¶ 69    Eychaner does not contest the designation of the River West TIF as a conservation area. That is, he does not contest that the area is under the threat of becoming blighted. Under *Gutknecht*, the government may use the power of eminent domain to prevent future blight in a conservation area such as the River West TIF. *Gutknecht*, 3 Ill. 2d at 545. Eychaner incorrectly argues that *SWIDA*'s holding foreclosed takings unless to eliminate already existing blight. Not so.

¶ 70    When determining the limits of the government's right to take private property, we will defer to the General Assembly's exercise of those powers. *Id.* at 543; *SWIDA*, 199 Ill. 2d at 236 ("Great deference should be afforded the legislature and its granting of eminent domain authority."). Under *SWIDA*, that deference evaporates when the public purpose behind the taking is a pretext, when a municipality uses eminent domain as a weapon to forcibly transfer property from one private owner to another. See *SWIDA*, 199 Ill. 2d at 240 ("While [SWIDA's] activities here were undertaken in the guise of carrying out its legislated mission, SWIDA's true intentions were not clothed in an independent, legitimate governmental decision to further a planned public use."); *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 478 (2005) (noting government would not be allowed "to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit"); *cf. Franco v. National Capital Revitalization Corp.*, 930 A.2d 160, 169 (D.C. 2007) (finding "pretext" to be valid affirmative defense to condemnation for economic redevelopment).

¶ 71    Recognizing the difference between a valid public use and a sham can be challenging. But a telling feature of sound public use in the context of economic redevelopment is the existence of a well-developed, publicly vetted, and thoughtful economic development plan. Such a plan was present in *Kelo*, 545 U.S. at 483-84, and *Gutknecht*, 3 Ill. 2d at 542-43, but absent in *SWIDA*, 199 Ill. 2d at 240 ("SWIDA did not conduct or commission a thorough study of the parking situation at [the racetrack]. Nor did it formulate any economic plan requiring additional parking at the racetrack."). A taking will likely pass constitutional muster where done in furtherance of a sound economic development plan, rather than the plan retroactively justifying the taking. *Cf. Romeo v. Cranston Redevelopment Agency*, 254 A.2d 426, 433 (R.I. 1969) ("governing bodies must either plan for the development or redevelopment of urban areas or permit them to become more congested, deteriorated, obsolescent, unhealthy, stagnant, inefficient and costly" (internal quotation marks omitted)).

¶ 72    The City had a plan when it created the PMD to promote industrial investment and prevent residential encroachment on existing factories. The City wanted to foster its industrial and commercial base while maintaining a diversified economy. In creating a large contiguous PMD, the City created an area where industrial and commercial users could rely on a stable and predictable zoning scheme. That stability would encourage investment, modernization, and expansion of existing industrial facilities while minimizing future conflicts between industrial and residential property owners. Investment would promote job growth and increase tax revenues. The City logically found that, given the increasingly residential nature of the area surrounding the Loop, existing manufacturing firms had little incentive to invest in their facilities–let alone stay in their current locations–especially

knowing that rising land values and taxes would soon make their current locations unfeasible if nearby residents complained about factory operations.

¶ 73    The City also created the River West TIF to further similar goals through the exercise of eminent domain and to act as a "financial mechanism" to implement the PMD. Before approving the River West TIF, the City thoroughly studied the proposed area and created strategies for its revitalization. One of the goals for the River West TIF, given the "inherent incompatibility between new residents and existing industry," was to minimize the conflict between residential and industrial uses. This included "protect[ing] and enhanc[ing] the remaining industrial areas already in proximity to the Loop," and creating buffer zones between industrial and residential uses. Anticipated benefits of the River West TIF included more economic and employment opportunities, increased tax revenue, and the prevention of blight. Moreover, in the ordinance authorizing the taking of Eychaner's land, the City found the eminent domain action in line with the goals of the River West TIF.

¶ 74    The findings associated with the PMD, the River West TIF, and the ordinance authorizing the taking of Eychaner's land do not indicate a sweetheart deal to help Blommer avoid paying full price for Eychaner's land on the real estate market, as was the case in *SWIDA*, 199 Ill. 2d at 239-40. On the contrary, these plans show the City, in good faith, considering the public use of taking Eychaner's land, and finding it in conformance with the goals of the Act, the PMD, and River West TIF to check future blight, to minimize the conflict between residential and industrial uses, and promote the economic revitalization of a conservation area. See 65 ILCS 5/11-74.4-3(n) (West 2004); *Northeast Parent & Child Society, Inc. v. City of Schenectady Industrial Development Agency*, 114 A.D.2d 741, 742 (N.Y. App. Div. 1985) (finding valid public use in taking of school for industrial use to retain local industry); *General Building Contractors, L.L.C. v. Board of Shawnee County Commissioners*, 66 P.3d 873, 883 (Kan. 2003) (holding development of industrial park valid public purpose of encouraging economic development).

¶ 75    Eychaner cites no evidence that the River West TIF and PMD were set up as a sham to take his property. He does not attack the findings of the study underlying the River West TIF, which noted the presence of four blighting factors, and the need for economic revitalization and reinvestment. See *Malec v. City of Belleville*, 407 Ill. App. 3d 610, 632 (2011) ("When a municipality approves the findings of blight in an ordinance, a presumption exists that the municipality's findings of blight were valid."). The goals of the River West TIF–to reduce blighting factors, prevent blight, foster the City's industrial base, prevent conflicts between residential and industrial uses, and retain existing industry–all constitute valid public uses. The taking of Eychaner's land to expand Blommer's industrial campus land furthers each of these goals and is thus a sound use of eminent domain.

¶ 76    Eychaner next argues that his property shows no signs of blight and therefore cannot be taken. Our supreme court long ago rejected this argument. See *City of Chicago v. Barnes*, 30 Ill. 2d 255, 257 (1964) ("the fact that there may be some sound buildings in the slum and blighted area is no defense to the proceedings. Property may be taken which, standing by itself, is unoffending, for the test is based on the condition of the area as a whole."); *Village of Wheeling v. Exchange National Bank of Chicago*, 213 Ill. App. 3d 325, 332 (1991) (same). The argument suffers from tunnel vision. The question of whether a taking prevents or eliminates blight focuses on the area in question–here, the River West TIF–not Eychaner's individual property.

¶ 77 Eychaner casts aspersions on the deal between the City and Blommer to expand Blommer's campus. Throughout his briefs, he implies that that deal was the impetus behind both the PMD and River West TIF. This is incorrect. Rather, the City conceived of the PMD and River West TIF as part of an economic revitalization plan. Blommer's objection to its inclusion in the PMD created a roadblock to the City's plan, which the City removed when it agreed to aid and fund the expansion of Blommer's campus. While numerous land owners objected to their inclusion in the PMD, the City only acted on Blommer's objection. Naturally, the City did not want the PMD to cause hardship to existing industry like Blommer–a result contrary to the stated purposes of the PMD and River West TIF. Accordingly, Eychaner's characterization is untrue.

¶ 78 Thus, the use of eminent domain to expand Blommer's campus passes constitutional muster because it aligns with the goals of the City's economic development plan to retain existing industry, prevent conflicts between residential and industrial use, and promote investment and revitalization in a conservation area.

¶ 79 The trial court properly denied Eychaner's traverse and motion to dismiss.

¶ 80                                 The "Scope of the Project" Rule

¶ 81 Eychaner next argues that the trial court erred when it denied his motion *in limine* to exclude reference to his property's PMD zoning. He asserts that the zoning was inadmissible under the "scope of the project" rule or "project influence" rule. We agree. Generally, we review the denial of a motion *in limine* for an abuse of discretion. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 250 Ill. App. 3d 665, 673 (1993). But where the issue is one of statutory interpretation, our review is *de novo*. *People v. Childress*, 338 Ill. App. 3d 540, 547 (2003).

¶ 82 Generally, the valuation date of condemned property is the time of filing the petition for condemnation. *City of Chicago v. Riley*, 16 Ill. 2d 257, 264 (1959). The "scope of the project" rule is an exception to this rule and is codified in the Eminent Domain Act (735 ILCS 30/1-1-1 *et seq.* (West 2012)). Regarding valuation, the rule states:

> "In the condemnation of property for a public improvement, there shall be excluded from the fair cash market value of the property any appreciation in value proximately caused by the improvement and *any depreciation in value proximately caused by the improvement*. However, such appreciation or depreciation shall not be excluded when property is condemned for a separate project conceived independently of and subsequent to the original project." (Emphasis added.) 735 ILCS 30/10-5-60 (West 2012) (formerly 735 ILCS 5/7-121 (West 2004) (no substantive differences)).

As Eychaner notes, this statute codifies the rule from *United States v. Miller*, 317 U.S. 369 (1943). See 3 Julius L. Sackman, Nichols on Eminent Domain § 8A.01(3)(a)-(b) (3d ed. 1997).

¶ 83 The facts of *Miller* clarify application of the rule. In *Miller*, the government flooded an area which a railroad passed through. *Miller*, 317 U.S. at 370. To compensate the railroad, the government selected sites as possible alternatives for the railway. *Id.* at 371. In the intervening years between the flood and building the new rail line, a town had sprung up on the now-valuable waterfront property created by the flooding. *Id.* When time came to relocate the railway, the government filed an action in eminent domain to take the

townspeople's land. *Id*. On the issue of just compensation, the trial court did not allow the jury to consider the increase in value that the flood caused, and the United States Supreme Court affirmed. The court reasoned that if "the public project *from the beginning* included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken." (Emphasis added.) *Id.* at 376-77. "The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use." *United States v. Reynolds*, 397 U.S. 14, 21 (1970).

¶ 84    Similarly, application of Illinois's "scope of the project" rule requires a two-step project. That is, an "original project" must cause an increase or decrease in the value of the condemnee's land, followed by a separate project "conceived independently of and subsequent to the original" in which the condemnee's land is taken. 735 ILCS 30/10-5-60 (West 2012); see *Conti v. Rhode Island Economic Development Corp.*, 900 A.2d 1221, 1233-34 (R.I. 2006) ("scope-of-the-project-rule cases often involve drawn out governmental projects, piecemeal takings separated by noticeable gaps in time, and some evidence that, in the interim, the market values of neighboring properties increased because of the projects").

¶ 85    The rule ensures that the price of the condemned land reflects the condemnee's reasonable expectation that its land would or would not be taken as part of the original project. See *Merced Irrigation District v. Woolstenhulme*, 483 P.2d 1, 12 (Cal. 1971) ("the increase in value of land which is initially expected to be outside the boundaries of a proposed improvement, must be recognized to constitute a proper element of just compensation"). If the condemnee reasonably did not expect the government to include its land as part of the original project, the price should reflect any increase or decrease caused by that project. But if the condemnee did reasonably expect the taking as part of the original project, the price should not take the existence of that project into account.

¶ 86    The initial question is the meaning of the term "public improvement." See 735 ILCS 30/10-5-60 (West 2012). Courts read statutes to ascertain and give effect to the intent of the legislature as evidenced by the plain and ordinary meaning of the statute's language. *People v. Donoho*, 204 Ill. 2d 159, 171 (2003). We may then consider "the reason for the law, the problems to be remedied, and the objects and purposes sought." *Id.* at 171-72.

¶ 87    "Public improvement" involves the ultimate use of the taken property or the public benefit resulting from the taking itself. The statute refers to the "public improvement" in terms of the purpose of the taking. 735 ILCS 30/10-5-60 (West 2012). Where land is taken for a park or a highway or similar public project, the park or highway is the "improvement." But the government may also take land in a blighted area without a plan for future use. *City of Chicago v. Barnes*, 30 Ill. 2d 255, 256-57 (1964). Where there is no planned use, the definition of the "public improvement" becomes more nebulous. Then, the "public improvement" is the public benefit that results from the taking.

¶ 88    Here, the "public improvement" is Blommer's expanded industrial campus, the ultimate use of Eychaner's property.

¶ 89    We next turn to application of the Illinois "scope of the project" rule, which in this case turns on whether the taking and the depreciation caused by the PMD occurred as a single project or as separate projects "conceived independently" of each other. 735 ILCS

30/10-5-60 (West 2012). Like the takings in *Miller*, 317 U.S. at 376-77, this case involves a single project.

¶ 90    The record indicates that the creation of the PMD, the River West TIF, and the taking of Eychaner's land were all a single project. The City began the process of creating the PMD in late 1999 with the goal of protecting industrial users like Blommer. The City's study regarding the River West TIF indicated that it was a "financial mechanism necessary to implement the goals and objectives of" the PMD. The taking of Eychaner's land was not only an integral part of creating the PMD, but also served to carry out the goals of PMD and River West TIF. Namely, the preservation of the City's industry, prevention of conflicts between industrial and residential uses, job creation, and increased tax revenue.

¶ 91    The City argues that the inclusion of Eychaner's land in the PMD, and the corresponding depreciation, was not part of the project to expand Blommer's factory. But, the City and Blommer conceived of the idea to expand Blommer's industrial campus during the process of creating the PMD. Blommer's support for the PMD was integral to its creation, and the City won that support by agreeing to help expand Blommer's facilities. Indeed, the expansion plans, which included Eychaner's land, were drawn up in May 2000, months before the City passed the ordinance creating the PMD.

¶ 92    The City further argues that Eychaner's land would have been included in the PMD even if it was not taken for Blommer's expansion. This, however, is speculative. No evidence indicates what might have happened had the City not agreed to aid Blommer. There might have been no PMD at all, or perhaps the boundaries might have been altered. But speculation does not provide a basis to support the trial court's ruling. *Cf. Rogers v. Matanda, Inc.*, 393 Ill. App. 3d 521, 527 (2009) ("The existence of proximate cause cannot be established by speculation, surmise, or conjecture." (Internal quotation marks omitted.)); *Parks v. Brinkman*, 2014 IL App (2d) 130633, ¶ 67 ("Speculation cannot take the place of evidence."). Accordingly, the PMD zoning–as a depreciation proximately caused by the improvement–should have been excluded under the Illinois "scope of the project" rule (735 ILCS 30/10-5-60 (West 2012)), and the trial court erred.

¶ 93    Eychaner characterizes the PMD zoning of his property as downzoning. We disagree. Generally, a collateral attack on the zoning at the time of a taking is not permitted in eminent domain proceedings. *Department of Public Works & Buildings v. Exchange National Bank*, 31 Ill. App. 3d 88, 98 (1975). Downzoning is an exception. Where the condemnor rezones a parcel of land to depress its value in future eminent domain proceedings, the condemnee may attack the validity of the rezoning ordinance. *Id*. There is no evidence that the City rezoned Eychaner's land to depress its value.

¶ 94                        Evidence of City's Motive Behind PMD Zoning

¶ 95    Eychaner next argues that the trial court erred in excluding some evidence of how the City adopted the PMD zoning. Having held that the trial court erred in allowing evidence of the PMD zoning under the Illinois "scope of the project" rule, the jury should not consider how the City adopted the zoning. As our supreme court stated long ago, the purpose in taking the land, "[w]hether or not the project is necessary or advisable, or the necessity for taking the property, or whether more property is taken than necessary *** are not questions for the jury." *St. Clair Housing Authority v. Quirin*, 379 Ill. 52, 57 (1942); see *Lake County Forest Preserve District v. O'Malley*, 96 Ill. App. 3d 1084, 1091 (1981) (holding that condemnor

may not appeal to jury's self interests in valuing property).

¶ 96                                  Appraisers' Testimony

¶ 97     Eychaner raises three issues with the testimony at trial, including the trial court: (i) allowing the City's calling MaRous and Thouvenell, who had once been disclosed as Eychaner's experts; (ii) not permitting Eychaner to cross-examine MaRous on his opinion of the reasonable probability of rezoning; and (iii) refusing to strike MaRous's testimony after he violated its *in limine* order. We review each of these for an abuse of discretion and find that the trial court abused its discretion in limiting the cross-examination of MaRous.

¶ 98     As to the first issue, Rule 218 states that "[a]ll dates set for the disclosure of witnesses *** shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates that trial will commence, unless otherwise agreed by the parties. This rule is to be liberally construed to do substantial justice between and among the parties." Ill. S. Ct. R. 218(c) (eff. July 1, 2014). Failure to disclose an expert within the 60-day timeframe does not mean the trial court must automatically bar the witness. *Hartman v. Pittsburgh Corning Corp.*, 261 Ill. App. 3d 706, 719 (1994). "Rather, the imposition of sanctions for a violation of discovery rules has always been, and still remains, a matter largely within the sound discretion of the trial court." (Internal quotation marks omitted.) *Id*. The trial court should consider prejudice and surprise to the opposing party when developing a sanction for late designation of expert witnesses. *Id.* at 720.

¶ 99     The trial court did not abuse its discretion in allowing the City to call MaRous and Thouvenell. The City added these two witnesses on October 31, 2012, when the trial was scheduled for November 5, 2012. The trial court declined to strike the two witnesses, but continued the start of trial to January 22, 2013. This course of action was well within the court's power. Because Eychaner formerly retained these witnesses, there was minimal prejudice to Eychaner's case that could not be cured by a simple continuance and verbal sanction. While the judge could have barred MaRous and Thouvenell from testifying, she was not required to do so.

¶ 100    Nevertheless, the trial court abused its discretion in limiting Eychaner's cross-examination of MaRous. Illinois Rule of Evidence 611(b) (eff. Jan. 1, 2011) states, "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Where the trial court limited cross- examination, we will only reverse if an abuse of discretion resulted in manifest prejudice to the limited party. *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 915 (2007).

¶ 101    But, the opinion of an expert is only as valid as the bases for that opinion. *Perona v. Volkswagen of America, Inc.*, 2014 IL App (1st) 130748, ¶ 51. A litigant may develop on cross-examination circumstances within the witness's knowledge or opinion that explain, discredit, or destroy the witness's testimony on direct although they may incidentally constitute new matter that aids the cross-examiner's case. *Anderson v. Mercy*, 338 Ill. App. 3d 685, 689 (2003). Facts, data, and opinions which form the basis of the expert's opinion but which are not disclosed on direct may be developed on cross-examination. *Id*. The cross-examiner may also elicit, emphasize, or otherwise call attention to facts or opinions avoided or minimized on direct examination. *Id*.

¶ 102    On direct examination, MaRous testified as follows:

"Q. [City's attorney:] *** [Y]ou provided an opinion of value of the subject property based on a highest and best use being commercial use permitted under PMD 5, correct?

A. [MaRous:] As *part* of my opinions, yes.

* * *

Q. *** I want to show you Plaintiff's Exhibit No. 111.

Do you recognize–do you understand what this says?

A. Yes.

Q. And can you read it to the jury?

A. Michael MaRous' opinions as of August 24, 2005, the fair cash market value of the subject property based on a highest and best use being a commercial use permitted under the existing PMD 5 zoning regulation is $2,550,000. This is equivalent to $100 per square foot of land area.

Q. And that is your opinion, correct?

A. Under *that* highest and best use, correct." (Emphases added.)

On cross-examination, MaRous opined as follows:

"Q. [Eychaner's attorney:] Now, [plaintiff's exhibit No. 111 is] you're opinion on the assumption that the highest and best use is a commercial use permitted under the existing PMD 5 zoning regulations; is that correct?

* * *

A. That is correct.

* * *

Q. Under the–what are the Uniform Standards of Professional Appraisal Practice?

A. They are rules that appraisers are required to follow.

Q. And under the Uniform Standards of Professional Appraisal Practice, what is an extraordinary assumption?

A. It is simply an assumption of something that is not in place that could happen.

Q. Okay. And is it correct to say here that this opinion is based on an *extraordinary assumption* that the subject site remains bound to the PMD in perpetuity?

MR. ASARO [City's attorney]: Objection, motion in limine. Ask to be heard.

THE COURT: Overruled.

THE WITNESS [MaRous]: That is correct." (Emphasis added.)

¶ 103    The City's limiting of MaRous's opinion to a canned statement should not have limited Eychaner's cross-examination. MaRous stated on direct that the solicited opinion only reflected part of his valuation, and on cross he noted his opinion was based on an "extraordinary assumption" that Eychaner's property could not be rezoned. The court erred in disallowing Eychaner from probing the sufficiency of MaRous's assumptions and the soundness of his opinions. *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 897-98 (1995).

¶ 104    The City argues that the trial court reasonably limited cross-examination of MaRous because Eychaner sought to elicit a different opinion from the one raised on direct. We

- 23 -

disagree. It is possible to describe every conclusion an expert reaches as a separate opinion. It is more accurate to describe MaRous's opinion regarding the reasonable probability of rezoning as an assumption underlying his valuation opinion. The weaknesses and strengths of assumptions underlying an expert's opinion constitute an area rightly explored and challenged on cross-examination. See *People v. Pasch*, 152 Ill. 2d 133, 179 (1992) (holding cross-examiner may probe expert's qualifications, experience, sincerity, weaknesses in basis, sufficiency of assumptions, soundness of opinion, and material reviewed but not relied on). Eychaner was entitled to impeach MaRous on cross-examination with his own opinion. This would undermine the reliability of MaRous's valuation opinion.

¶ 105    Last, the trial court did not abuse its discretion in refusing to strike MaRous's testimony for violating its *in limine* order. While MaRous did identify Eychaner as the one who originally retained him, the trial court struck that testimony. It later gave a curative instruction that the jury should disregard and not consider the statement. "A jury is presumed to have followed the court's instruction to disregard testimony." *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 170 (2003). Eychaner submits no proof that the jury failed to follow the trial judge's instruction. See *Kamp v. Preis*, 332 Ill. App. 3d 1115, 1127 (2002) (a claim of prejudice from stricken testimony without firm basis does not indicate abuse of discretion). But the jury knowing that Eychaner originally retained MaRous may have compounded the other errors already noted. We are confident that the parties and witnesses will strictly comply with the trial court's rulings on motion *in limine* on remand.

¶ 106                                    The Jury Verdict

¶ 107    Eychaner argues that the jury's verdict was the product of a clear and palpable mistake based on the above errors. Because we are reversing for a new trial, we decline to address this issue.

¶ 108    Affirmed in part and reversed in part. Cause remanded.